Strafford,
March 4, 1941. } No. 3222.

ROMEO J. LAVIGNE *v.* SADIE NELSON.

SADIE NELSON *v.* ROMEO J. LAVIGNE.

NELLIE MALONE *v.* SAME.

ESTHER THORNTON *v.* SAME.

ROBERT NELSON (*by his father and next friend*) *v.* SAME.

SARAH A. NELSON, *Adm'x v.* SAME.

ALBERT S. BETTENCOURT, *Adm'r v.* SAME.

THOMAS J. MALONE, *Adm'r v.* SAME.

PAUL THORNTON (*by his father and next friend*) *v.* SAME.

*John W. Blakeney, Jr.,* (of Massachusetts) and *Robert E. Earley* (*Mr. Blakeney* orally), for Sadie Nelson and the plaintiffs in the actions against Lavigne.

*F. Maurice LaForce* and *Hughes & Burns* (*Mr. Burns* orally), for Romeo J. Lavigne.

MARBLE, J.   At the time of the accident there were eight persons riding in the Nelson car.   They had left Bethlehem at about seven

o'clock that evening. Their destination was Dorchester, Massachusetts. Some of their baggage was fastened to the outside of the car, a bag between each fender and the hood and a third bag tied to the back of the car. Mrs. Nelson testified that their speed at no time exceeded thirty-five miles an hour.

The truck with which the car collided was known as Lavigne's Red Wing Express. The body of this truck was eighty-four and three-quarters inches in width, and the length of the truck from the front bumper to the rear end was about twenty-two and a half feet. Enos was driving the truck from Boston to Berlin. It was loaded with tile pipe and other freight.

The occupants of the sedan had turned on the radio and were listening to the broadcaster's account of a prize fight then in progress. All those who survived the accident testified that the sedan was on the right-hand side of the road when the collision occurred. None of them saw the truck until a moment before the collision. Mrs. Bettencourt, who was driving the car, was killed in the accident.

Enos left Boston early in the afternoon. He had difficulty with the ignition and carburetor of the truck and was delayed at several points along the route. The accident occurred at about eleven o'clock.

The left side of the sedan, which collided with the left front and side of the truck, was completely demolished, and the left front wheel of the car was found embedded in the pavement. There were marks indicating that dual tires such as those on the rear wheels of the truck had passed over it. Photographs taken at the request of the County Solicitor the morning after the accident show the complete circle of the brake drum imprinted on the surface of the highway with what appears to be dual-tire marks on the north and south side of the circle.

Enos testified that it was a foggy night and that he first saw the lights of the sedan when they were from two to three hundred feet distant; that he was on the east or right-hand side of the road, and that as the lights drew nearer he observed that the approaching car was on the same side of the road; that when it became evident that the driver of the car was not going to turn to the west side, he sounded his horn and pulled the truck farther over to the right so that its right wheels were entirely off the traveled surface, and that the collision followed.

A state motor-vehicle inspector who visited the scene of the accident that night very soon after the collision testified that he found

the imprint "of a set of dual tires running along" in the soft dirt on the east side of the road and extending northerly, parallel with the highway, beyond the point where the wheel of the sedan had been pressed into the pavement. He also testified that he removed this wheel, over which dual tires had apparently run, and that the brake drum left a circular indentation in the tarvia. The civil engineer who made the plan used at the trial testified that the width of the highway was about twenty-one feet and that the distance from the easterly edge of the circle to the easterly side of the road was only five and a half feet. If the accident occurred at this point, it is evident that the right-hand wheels of the truck were off the traveled surface of the road.

The car ran some distance beyond the point of collision, turned completely around and came to a stop on the west side of the road about eighty feet south of the place where the wheel had been crushed. Its apparent course was indicated by tire marks on the tarvia. These marks are shown very distinctly in the photographs. They are of varying width and are referred to in the evidence as scuff marks. They begin just north of the disk-like indentation and extend southward in wide, sweeping semicircles first toward the west, then toward the east, and then back to the west again. They point unmistakably to the fact that the collision must have taken place close to the spot where the wheel was found.

This conclusion is strengthened by the appearance of long, irregular gouges or scorings on the surface of the road extending south from a point immediately west of the circle. There was opinion evidence to the effect that these marks were caused by the left front spindle from which the wheel of the sedan had been severed. The motor-vehicle inspector testified that he found bags and clothing strewn all along the road from the embedded wheel to a point south of the wrecked car, and that he also found close to the wheel a suitcase and flesh. He was definite in his assertion that no "wreckage" was found north of that spot.

Counsel for the plaintiffs contend that the accident occurred on the west side of the road at a point some eighteen feet northwest of the circular impression, where a few slight scratches are shown on two of the photographs. This contention seems quite untenable, for the scratches in question bear no apparent relation to the wheel print and the indications of gouging and tire scuffing which extend southward toward the car. The position of the car had not been changed at the time the photographs were taken.

While ordinarily it is the province of the jury to resolve conflicts in oral testimony, here the inferences to be drawn from the undisputed location of the marks in the highway, from the appearance of the sedan and the truck, and from the admitted measurements so decisively demonstrate that the collision occurred on the east side of the road that all testimony to the contrary must be rejected. It is a well-established rule that oral testimony must yield to indisputable physical facts. *Brown* v. *Mailhot*, 89 N. H. 240.

On all the credible evidence it cannot fairly be found that Enos was guilty of any legal fault. If it be suggested that his speed of thirty or thirty-five miles an hour was excessive in view of the fog, the answer is that the surviving occupants of the Nelson car, though denying the existence of any fog, all say that they did not see the truck until it was practically upon them. Whether, if the speed had been slower, Mrs. Bettencourt would have discovered the truck in time to have turned seasonably to the right is entirely conjectural. The speed was not *prima facie* unreasonable, since the speed limit for that locality, as posted by the Commissioner of Motor Vehicles under the authority of section 1 of chapter 125 of the Laws of 1937, was forty-five miles an hour.

But the plaintiffs argue that Enos was negligent in his manipulation of the lights of the truck. The following excerpt is taken from their brief: "The plaintiffs do not admit that there were any lights on the Lavigne truck until an instant before the impact. It is probable that Enos had been having trouble with them. There is no doubt that something was wrong with the ignition and he may have been manipulating the lights as he came along the road. An instant before the collision, he may have momentarily put them off and then suddenly turned them on. This could readily account for the failure of some of the plaintiffs to notice them until an instant before the crash occurred."

The difficulty with this argument lies in the fact that it is based largely on supposition rather than evidence. Eight persons were crowded into a small car. Some were sitting on the knees of others. The view was necessarily limited, and some, if not all, were listening intently to a broadcaster's description of a sensational prize fight. Testimony that, under these conditions, the lights of the truck were not seen until a moment before the collision is insufficient to prove that they were unlighted as the truck approached.

Nor does the doctrine of the last clear chance apply. As soon as Enos had stopped the truck he returned to the scene of the accident

and said to Mrs. Nelson: "I am so sorry. The lights blinded me and I couldn't see." This statement was not an acknowledgment on Enos' part that the accident occurred on the west side of the road. It was merely an expression of regret coupled with an implication that he might perhaps have acted differently if his sight had not been affected by the lights of the sedan. But, considering the speed at which the truck and the sedan were approaching each other, he had at most but a second or two in which to act after becoming aware that the driver of the approaching car was inattentive. Since the last chance must be a clear chance and the doctrine has reference only to the existing situation, his failure to do more than he did in such a contingency cannot fairly be deemed negligence. *Ramsdell* v. *Company*, 86 N. H. 457, 462, and cases cited; *Paulette* v. *Railroad*, 88 N. H. 10, 12.

Mrs. Nelson, the owner of the sedan, was present and had been driving until she stopped the car at a filling station fourteen miles north of the place where the accident occurred. She then requested Mrs. Bettencourt to drive. There can be no question but that Mrs. Bettencourt as driver was subject to Mrs. Nelson's direction and control and that Mrs. Nelson could have resumed manual control of the car at any time. She so testified. She was therefore responsible for Mrs. Bettencourt's conduct in the operation of the car. *Ricard* v. *Company*, 86 N. H. 433, 435. See, also *Bowdler* v. *Company*, 90 N. H. 68, 70, and cases cited. And since the damage to the truck was caused by Mrs. Bettencourt's violation of the law of the road (P. L., c. 90, s. 1), Mrs. Nelson would be liable. *Prescott* v. *Yurchus*, 86 N. H. 108.

The motions of Lavigne for directed verdicts in all cases should have been granted, but since the damages have not been determined in the action of *Lavigne* v. *Nelson*, there must be a new trial of that issue.

The plaintiff's contention that this court should not entertain an exception to the denial of a motion for a directed verdict in a case where the jury has disagreed is contrary to the settled practice in this jurisdiction. Such exceptions were entertained in the following cases: *Staples* v. *Railroad*, 74 N. H. 499; *Haakensen* v. *Company*, 76 N. H. 443; *Hayes* v. *Railroad*, 78 N. H. 581; *Collins* v. *Hustis*, 79 N. H. 446; *Keck* v. *Hinkley*, 90 N. H. 181; *Bouley* v. *Company*, 90 N. H. 402.

The plaintiffs object to the fact that the record in the present cases "was abridged by order of the trial judge and that certain

parts of the testimony of various witnesses were thereby deleted." It is not only proper but desirable that transcripts of evidence be carefully edited before transfer to this court. Matter which is not germane to the questions of law presented by the exceptions merely serves to encumber the record without benefitting either party. See *Godsoe* v. *Company*, 75 N. H. 67, 68. There is here no contention that evidence relevant to the issue of liability has been deleted. As we understand the situation, there appears to be no reason for compliance with the plaintiffs' suggestion that final disposition of the cases be deferred.

*In the first-named action, new trial, limited to the issue of damages: in the other actions, judgments for the defendant.*

All concurred.