FLORENCE V. T. STEEVES *v.* NEW ENGLAND
TELEPHONE & TELEGRAPH CO.

*Murchie & Murchie (Mr. Alexander Murchie* orally), for the plaintiff.

*Hughes & Burns (Mr. Walter A. Calderwood* orally), for the defendant.

PAGE, J. I. The plaintiff discovered on the morning of the trial some indications of unevenness in the floor, but only by the use of a level. The denial of the motion to amend, made after the trial began, was within the discretion of the trial court, and it does not clearly appear that the exercise of discretion was erroneous. No question of law is raised. *Piper v. Hilliard,* 58 N. H. 198; *Lyons v. Child,* 61 N. H. 72.

II. The question of the sufficiency of the evidence to justify the submission of the case to the jury may be discussed in two branches.

(1) Would the evidence of unevenness in the floor have justified a finding that such a defect in the construction caused or helped to cause the plaintiff's fall? Evidence of the defect as a contributory cause, in combination with the alleged slippery condition of the floor, was freely admitted. If the defect was not findably causal in part, it could not be found to be the cause under the declaration, if amended.

There was some evidence of a "hump" in the floor which showed a lowering of grade amounting to three-eighths of an inch in a lateral

distance of two and a half feet. Whether such a slight grade, imperceptible to the eye of any witness and not discovered on an earlier inspection by one of the plaintiff's experts, could cause the plaintiff to fall, depended upon opinion evidence. But opinion evidence favorable to the plaintiff could obtain ultimate standing only if it could be found that the plaintiff in fact slipped on the "hump." This "hump" was accurately placed by the evidence, but the evidence as to the precise place where the plaintiff fell is so vague that it is at best conjectural whether she fell on the "hump."

The floor of the office was laid with asphalt tiles six inches square. Extending from the door of the room to the cashier's desk, there was a rubber mat four feet wide. At the right of the mat, as one entered the room from the vestibule, was a directory table or writing desk, which could be reached only by stepping off the mat and walking on the tile. As was her custom, the plaintiff left the mat in order to go to this table, where she expected to lay her parcels before going to the cashier's desk to pay her monthly bill. She stepped off with her right foot, and fell before she took another step.

The "hump" was nearly opposite the middle of the table. If the plaintiff had walked along the mat a distance of eleven and a half feet, and had then stepped off, her foot might have reached the "hump" on the first step. The detailed plan shows that this was the furthest point at which she was likely to leave the mat. A single step off at any point nearer the door than ten feet (the ten-foot point also was opposite the table) could not have brought her to the "hump." On the testimony taken most favorably for the plaintiff, there is nothing to show that she stepped off the mat except somewhere in the general vicinity of the table. This is insufficient to make her contact with the "hump" more than pure conjecture.

The plaintiff's own testimony is against her at this point. She first said that she passed through the vestibule, whence the door led to the office, and then "walked right straight along over to that desk" (the directory table or writing desk). If this testimony were taken at face value, she could not have reached the "hump" without taking more than a single step on the tiles and she more than once stated explicitly that she took but a single step from the mat. This was on direct examination by her counsel. If she was mistaken or misled, she had opportunity to clarify her testimony on re-direct, when the following testimony was given.

"Q. Now with reference to Mr. Burns asking if you stepped off at the same place to go to that little desk each time, you said that

you could not say you stepped off the same place. Did you always have one certain place on which you stepped off? A. No, I just went right along. Q. Just as it happened? A. Just as it happened. Q. This day you stepped off about where with regard to that desk, if you remember? If you don't remember it is all right. A. I don't remember." This is clear, definite testimony, by which she is bound. *Harlow* v. *LeClair*, 82 N. H. 506.

Later, on re-cross examination, she was asked, "you stepped off at about the same place as you always had?" She replied, "No, I think it was a little farther back. . . ." If this impression is entitled to any credit in view of her testimony that she could not remember, it means that she stepped off short of the "hump." If it is not to be believed, then the plaintiff's own testimony leaves it entirely conjectural whether the "hump" had anything to do with her fall.

A scratch, which may or may not have been made by the plaintiff's heel on the tile, was not related by any testimony to the "hump," except conjecturally. On the other hand two of the defendant's employees testified that the plaintiff fell at a point opposite the space between the little table and the telephone, well before she reached the "hump." Conjecture cannot take the place of definite testimony in this regard.

It could not be found that the "hump," either as a separate structural defect, or in conjunction with the slippery condition of the floor, had any part in causing the plaintiff's fall.

(2) The other issue on which the case was offered to the jury was the condition of the floor without respect to the "hump." The plaintiff claimed that the tiles were highly polished with wax so lately applied as to make them very slippery. According to every witness the tiling was such as is in common use, and so far the evidence favors the defendant. It was laid in 1929. For four years after that it was waxed periodically. The defendant's evidence was consistent and definite that the tiles were never waxed from 1933 to the date of the accident in 1937. In legal theory, this might be disbelieved, but that would leave the plaintiff with her original burden of proving that it had been waxed meanwhile.

The position taken by the plaintiff's expert witnesses was that such a tile floor ought to be waxed; that waxing was reasonable and proper care; that a floor so waxed would be perfectly safe. But they said it would be unsafe if rugs or mats were laid on such a floor. So the laying of the mat in February, 1937, according to them, created a new danger where all was safety before. Their theory depended

upon the contrast between the safe footing upon the rubber mat and a slippery tiling which would otherwise be amply safe. They thought that the floor was reasonable except for this combination of mat and slippery waxed tiles.

As one of them said, "a person that's walking on a mat has an unconscious feeling of stability . . . and you step off from that mat where you have been gripping it with your feet and you don't expect that slide that's coming." Therefore he concluded with the opinion that the combination is not good practice. But since the theory depends upon slippery waxed tiles, he and the other experts admitted that there would be no danger if the tiling had not been waxed for the period of four years as claimed by the defendant. The plaintiff's whole case therefore depended upon her showing (a) that the tiles were slippery from being waxed recently before her fall, and (b) that the combination caused her fall. It was admitted that the lighting of the office was excellent, that the floor was dry, and that there was no foreign substance on the floor when she entered.

(a) The testimony that the tiles had been waxed shortly before the accident was not positive. The plaintiff herself said only that the floor was "very very highly polished." She at no time said that it was slippery. There was some testimony that the floor shone, but this was consistent with the well-known "high-lighting" qualities of dark, smooth material. The witnesses, other than the plaintiff and the employees of the defendant, who actually saw the floor on the day of the accident, make no single suggestion that there was surface wax on the tiling. If there was any such wax nobody appears to have identified it.

Right after the accident, a friend of the plaintiff saw two men scuffing about on the floor. This friend tested with the ball of her foot and thought it slippery. Her only other characterization of the floor was "shiny" and "polished." Nobody appears to have had the slightest trouble with slipping during these experiments on the spot "to see how slippery it was." Another witness said that the tiling was polished and somewhat slippery, but based this solely on the fact that the floor looked shiny. Though he made no particular experiments, he did walk about freely without difficulty. The doctor who attended the plaintiff entered without looking at the floor, moved about without special attention and care, and had no trouble at all.

For evidence of surface wax in July, 1937, the plaintiff's case depended upon the opinion of experts, based upon examinations of the

floor made from June 5, 1940, to the time of the trial some months later. None of the experts found any surface wax of moment except next to the walls and under the furniture, which were spots where the plaintiff did not step and where there had been no traffic to wear off the wax admittedly placed there from 1929 to 1933. Under the mat, laid in February, 1937, they found enough wax to make "somewhat of a sheen." Whether or not any of this was surface wax does not appear. It definitely appeared that there was more wax evident under the mat than beside it, but for all that appears it may have been wholly in the pores. The wax found in the tiling beside the mat was plainly wholly in the pores, and none of it on the surface. Wax in the pores was to be expected if the tiles had ever been waxed. This pore wax resulted in a "slight gloss" when rubbed with a cloth. If there is any difference between "somewhat of a sheen" and a "slight gloss," such that the former may indicate surface wax, while the latter does not, the record does not disclose it. If there was wax on the surface of the tiles when the mat was laid, it must have been preserved by the mat. Yet the condition of the surface under the mat and beside it, as the experts testified to it, shows no substantial difference.

Nevertheless the experts gave it as their opinion that the tiling beside the mat had been waxed within a few months before their examination, though they said there was less wax there than under the mat. The final ground of reliance for this opinion was that the tile would have been worn half through if not frequently waxed. Specimens of tile in evidence appear to have a very hard surface. This non-contemporary opinion evidence, under all the circumstances, is unreliable to establish a basic fact which was supported by no contemporary observation of surface wax in 1937. There is no reliable evidence that there was such wax at that time.

(b) The causal character of the combination of the mat with tiling in fact waxed and slippery merits consideration. The plaintiff's case rests upon the theorizing of the experts regarding the supposed dangers of stepping from a rubber mat to tiling, in fact waxed, and slippery because of such waxing. Even if the theory does not meet with difficulties from common knowledge of the practice to maintain similar combinations in similar places, it is met squarely by the plaintiff's own testimony. Men who had no knowledge of the situation in July, 1937, but only of the situation three years later, formed a theory of what happened, based on an assumed fact that they never observed (they did not find a slippery floor next to the

mat), and based further on the supposed psychological reactions of persons using a floor in the condition assumed.

The plaintiff, although she called the floor "very very highly polished," did not call it slippery. She was perfectly familiar with the mat and the floor. She knew the difference in the texture of the two materials, when she entered on the day of the accident. She already knew the difference in sensation and feeling when she stepped from one to the other. The element of psychological ignorance or surprise which is a necessary element of the experts' theory, was totally lacking. She had stepped from mat to tile on some five prior occasions, and with the conditions all substantially the same, even to the shoes that she wore. She said positively and clearly that the mat made no difference; that she could walk as easily and safely with the mat on the floor as she had for years prior to the laying of the mat. She knew what she was talking about, for she had entered the office monthly since 1929 and had customarily gone first to the directory table to deposit her bundles.

Against this positive factual evidence, which the jury were bound to believe, the opinions of experts as to the cause of the accident, or conversely the effect of the combination of the mat and tile as she knew it and they did not, is entirely unsubstantial. These "opinions" are no more than theories advanced against direct proof of lack of causation given by the plaintiff herself, on the basis of fact and experience that were actual and contemporary. Her testimony was factual, that of the experts was matter of theory not so based.

Moreover, the plaintiff's observation and experience is supported not only by the experience of neutral witnesses of contemporary conditions, but also by the fact that during all the years when more than ten thousand customer-callers have stepped from mat to tile, as is reasonably estimated, nobody but the plaintiff ever fell.

Upon the record, the case should have been withdrawn from the jury.

III. There is doubt whether the plaintiff excepted to the exclusion of the evidence of the "hump" as a defect of construction. Assuming that she did, the exclusion was harmless. The evidence was admitted for every other purpose, was thoroughly gone into, and could not in its most favorable light be found causal. Other exceptions of the plaintiff to the admission and exclusion of evidence have not been briefed, and appear to have been waived.

IV. The present transfer was properly made, even though the jury had disagreed. *Lavigne* v. *Nelson*, 91 N. H. 304, 309.

The plaintiff's exceptions are overruled. The defendant's exceptions to the denial of its motions for a nonsuit and for a directed verdict are sustained.

*Judgment for the defendant.*

BURQUE, J., did not sit: the others concurred.