Clarence BOREL, Plaintiff-Appellee,

v.

FIBREBOARD PAPER PRODUCTS COR-
PORATION et al., Defendants-
Appellants,

National Surety Corporation,
Intervenor-Appellee.

No. 72-1492.

United States Court of Appeals,
Fifth Circuit.

Sept. 10, 1973.

Rehearing and Rehearing En Banc
Denied May 13, 1973.

George A. Weller, Beaumont, Tex., for Fibreboard Paper Prod. Corp.

George E. Duncan, Beaumont, Tex., for Pittsburg Corning Corp; W. Page Keeton, Austin, Tex., of counsel.

W. N. Arnold, Jr., Houston, Tex., for Philip Carey Corp. and Armstrong Cork Corp.

John G. Tucker, Gordon R. Pate, Beaumont, Tex., for Johns Manville Prod. Corp.

Ward Stephenson, Orange, Tex., for Clarence Borel.

George E. Murphy, Beaumont, Tex., for Nat'l Surety Corp.

Robert E. Barnes, Beaumont, Tex., for Ruberoid Co.

Before TUTTLE, WISDOM and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge:

This product liability case involves the scope of an asbestos manufacturer's duty to warn industrial insulation workers of dangers associated with the use of asbestos.

Clarence Borel, an industrial insulation worker, sued certain manufacturers of insulation materials containing asbestos to recover damages for injuries caused by the defendants' alleged breach of duty in failing to warn of the dangers involved in handling asbestos. Borel alleged that he had contracted the diseases of asbestosis and mesothelioma as a result of his exposure to the defendants' products over a thirty-three year beginning in 1936 and ending in 1969. The jury returned a verdict in favor of Borel on the basis of strict liability. We affirm.

I.

Clarence Borel began working as an industrial insulation worker in 1936. During his career, he was employed at numerous places, usually in Texas, until disabled by the disease of asbestosis in 1969. Borel's employment necessarily exposed him to heavy concentrations of asbestos dust generated by insulation materials. In his pre-trial deposition,

Borel testified that at the end of a day working with insulation material containing asbestos his clothes were usually so dusty he could "just barely pick them up without shaking them." Borel stated: "You just move them just a little and there is going to be dust, and I blowed this dust out of my nostrils by handfuls at the end of the day, trying to use water too, I even used Mentholatum in my nostrils to keep some of the dust from going down in my throat, but it is impossible to get rid of all of it. Even your clothes just stay dusty continually unless you blow it off with an air hose."

Borel said that he had known for years that inhaling asbestos dust "was bad for me" and that it was vexatious and bothersome, but that he never realized that it could cause any serious or terminal illness. Borel emphasized that he and his fellow insulation workers thought that the dust "dissolves as it hits your lungs". He said:

A. Yes, I knew the dust was bad but we used to talk [about] it among the insulators, [about] how bad was this dust, could it give you TB, could it give you this, and everyone was saying no, that dust don't hurt you, it dissolves as it hits your lungs. That was the question you get all the time.

Q. Where would you have this discussion, in your Union Hall?

A. On the jobs, just among the men.

Q. In other words, there was some question in your mind as to whether this was dangerous and whether it was bad for your health?

A. There was always a question, you just never know how dangerous it was. I never did know really. If I had known I would have gotten out of it.

Q. All right, then you did know it had some degree of danger but you didn't know how dangerous it was?

A. I knew I was working with insulation.

Q. Did you know that it contained asbestos?

A. Yes, sir, but I didn't know what asbestos was.

When asked about the use of respirators, Borel replied that they were not furnished during his early work years. Although respirators were later made available on some jobs, insulation workers usually were not required to wear them and had to make a special request if they wanted one. Borel stated that he and other insulation workers found that the respirators furnished them were uncomfortable, could not be worn in hot weather, and—"you can't breathe with the respirator." Borel further noted that no respirator in use during his lifetime could prevent the inhalation of asbestos dust. As an alternative precaution, therefore, he would sometimes wear a wet handkerchief over his nostrils or apply mentholatum, but these methods were also unsatisfactory and did not exclude all the dust.

Borel stated that throughout his early working life and until the mid-1960's he was in good health, except for pains caused by lung congestion that his doctor attributed to pleurisy. In 1964, a doctor examined Borel in connection with an insurance policy and informed him that x-rays of his lung were cloudy. The doctor told Borel that the cause could be his occupation as an insulation worker and therefore advised him to avoid asbestos dust as much as he possibly could.

On January 19, 1969, Borel was hospitalized and a lung biopsy performed. Borel's condition was diagnosed as pulmonary asbestosis. Since the disease was considered irreversible, Borel was sent home. Borel testified in his deposition that this was the first time he knew that he had asbestosis.

Borel's condition gradually worsened during the remainder of 1969. On February 11, 1970, Borel underwent surgery for the removal of his right lung. The examining doctors determined that Borel had a form of lung cancer known as mesothelioma, which had been caused by asbestosis. As a result of these dis-

eases, Borel later died before the district case reached the trial stage.

The medical testimony adduced at trial indicates that inhaling asbestos dust in industrial conditions, even with relatively light exposure, can produce the disease of asbestosis.[1] The disease is difficult to diagnose in its early stages because there is a long latent period between initial exposure and apparent effect. This latent period may vary according to individual idiosyncrasy, duration and intensity of exposure, and the type of asbestos used. In some cases, the disease may manifest itself in less than ten years after initial exposure. In general, however, it does not manifest itself until ten to twenty-five or more years after initial exposure. This latent period is explained by the fact that asbestos fibers, once inhaled, remain in place in the lung, causing a tissue reaction that is slowly progressive and apparently irreversible. Even if no additional asbestos fibers are inhaled, tissue changes may continue undetected for decades. By the time the disease is diagnosable, a considerable period of time has elapsed since the date of the injurious exposure. Furthermore, the effect of the disease may be cumulative since each exposure to asbestos dust can result in additional tissue changes. A worker's present condition is the biological product of many years of exposure to asbestos dust, with both past and recent exposures contributing to the overall effect. All of these factors combine to make it impossible, as a practical matter, to determine which exposure or exposures to asbestos dust caused the disease.

A second disease, mesothelioma, is a form of lung cancer caused by exposure to asbestos. It affects the pleural and peritoneal cavities, and there is a similarly long period between initial contact and apparent effect. As with asbestosis, it is difficult to determine which exposure to asbestos dust is responsible for the disease.[2]

At issue in this case is the extent of the defendants' knowledge of the dangers associated with insulation products containing asbestos. We pause, therefore, to summarize the evidence relevant to this question.

Asbestosis has been recognized as a disease for well over fifty years.[3] The first reported cases of asbestosis were among asbestos textile workers. In 1924, Cooke in England discovered a case of asbestosis in a person who had spent twenty years weaving asbestos textile products.[4] In the next decade, numerous similar cases were observed and discussed in medical journals. An investigation of the problem among textile factory workers was undertaken in Great Britain in 1928 and 1929.[5] In the United States, the first official claim for compensation associated with asbestos was in 1927.[6] By the mid-1930's, the hazard of asbestosis as a pneumoconiotic dust was universally accepted.[7] Cases of asbestosis in insulation workers

1. For a discussion of asbestosis and its effect on industrial insulation workers, see Selikoff, Bader, Bader, Churg and Hammond, Asbestosis and Neoplasia, 42 Am.J.Med. 487 (1967); Selikoff, Churg, and Hammond, The Occurrence of Asbestosis Among Insulation Workers, 132 Ann. New York Acad.Sc. 139 (1965).

2. Id.

3. Asbestos has been known to man since ancient times. As a generic term, it applies to a number of inorganic, fibrous, silicate minerals that possess a crystaline structure. Asbestos is incombustible in air and separable into filaments. It was used as an insulator against heat as early as 1866, and asbestos cement was introduced about 1870. Asbestos insulation material has been commercially produced since at least 1874.

4. Cooke, Fibrosis of the Lungs Due to the Inhalation of Asbestos Dust, 2 Brit.Med.J. 147 (1924); Cooke, Pulmonary Asbestosis, 2 Brit.Med.J. 1024 (1927).

5. Merewether and Price, Report on the Effects of Asbestos Dust on the Lungs and Dust Suppression in the Asbestos Industry (1930).

6. Lanza, Asbestosis, 106 J.A.M.A. 368 (1936).

7. H.R.Rep.No.14816, 90th Cong., 2d Sess. 349, 355 (1968). Dr. I. J. Selikoff of the

were reported in this country as early as 1934.[8] The U.S. Public Health Service fully documented the significant risk involved in asbestos textile factories in a report by Dreessen et al., in 1938.[9] The authors urged precautionary measures and urged elimination of hazardous exposures.

The first large-scale survey of asbestos insulation workers was undertaken in the United States by Fleischer-Drinker et al., in 1945.[10] The authors examined insulation workers in eastern Navy shipyards and found only three cases of asbestosis. They concluded that "asbestos covering of naval vessels is a relatively safe operation." Significantly, ninety-five percent of those examined had worked at the trade for less than ten years. Since asbestosis is usually not diagnosable until ten to twenty years after initial exposure, the authors' conclusion has been criticized as misleading.[11] Perhaps recognizing this possibility, the authors cautioned that the study did not "give a composite picture of the asbestos dust that a worker may breathe over a period of years",

and that "if pipe coverers had worked steadily [under conditions] where the amount of asbestos dust in the air was consistently high, the incidence of asbestosis among these workers would have been considerable greater." The authors stated that "the suggestions relative to exhaust ventilation and respiratory protection are therefore of value in maintaining this low incidence of asbestosis".[12]

In 1947, the American Conference of Governmental Industrial Hygienists, a quasi-official body responsible for making recommendations concerning industrial hygiene, issued guidelines suggesting threshold limit values for exposure to asbestos dust. In its first report, the ACGIH recommended that there should be no more than five million parts per cubic foot of air. It later determined in 1968 that the threshold limit value should be reduced to two million.[13]

Throughout the 1950's and 1960's, further studies and medical reports on asbestosis were published. In 1965, I. J.

School of Environmental Sciences Laboratory, Mount Sinai School of Medicine, City University of New York, stated:

In 1924, which is a little over 40 years ago, Dr. Cooke in England described a case of a woman dying of severe lung scarring who had spent 20 years in a textile factory, weaving asbestos, and in the next decade many similar cases were reported, so that by the mid-1930's the hazard of asbestos as a pneumoconiotic dust was pretty universally accepted.

Textile factories in this country, most of them in the southern part of our country, were also studied and our Public Health Service fully documented the very significant risks involved in asbestos textile factories and a classic report by Dreessen and his colleagues which was published by the GPO in 1938. Precautionary measures were urged in this report and elimination of hazardous exposures were strongly recommended.

As I sit here now, I am unhappy to say that unfortunately implementation of these recommendations has been haphazard and inadequate and that conditions and dangers so well recognized and so well described 40 years ago are still with us. It is an unhappy reflection on all of us—government, public health authorities, and my

own medical profession—that at this time in the United States in the 1960's 7 percent of all deaths among insulation workers in this country are due to a completely preventable cause, pulmonary asbestosis.

8. Ellman, Pneumoconiosis, 14 Brit.J.Radiol. 361 (1934).

9. Dreessen et al., A Study of Asbestosis in the Asbestos Textile Industry, Public Health Bull. No. 241 (1938).

10. Fleischer, Viles, Gade and Drinker, A Health Survey of Pipe-Covering Operations in Constructing Naval Vessels, 28 J.Indust. Hyg. 9–16.

11. Selikoff et al., Asbestosis and Neoplasia, 42 Am.J.Med. 487 (1967).

12. Fleischer, supra note 10 at 15.

13. See Documentation of the Threshold Limit Values for Substances in Workroom Air, A. C.G.I.H. (3 ed. 1971). The A.C.G.I.H. has described the threshold limit values as "conditions under which it is believed that nearly all workers may be repeatedly exposed, day after day, without adverse effect. The values list refer to time-weighted average concentrations for a normal workday. The amount by which these figures may be ex-

Selikoff and his colleagues published a study entitled "The Occurrence of Asbestosis Among Insulation Workers in the United States." [14] The authors examined 1,522 members of an insulation workers union in the New York-New Jersey metropolitan area. Evidence of pulmonary asbestosis was found in almost half the men examined. Among those with more than forty years experience, abnormalities were found in over ninety percent. The authors concluded that "asbestosis and its complications are significant hazards among insulation workers".[15] Other studies have since confirmed these findings.[16]

ceeded for short periods without injury to health depends upon a number of factors such as the nature of the contaminant, whether very high concentrations even for short periods produce acute poisoning, whether the effects are cumulative, the frequency with which high concentrations occur, and the duration of such periods."
See Threshold Limit Values for 1961, A.C.G. I.H. (1961).

14. Selikoff, Churg, and Hammond, The Occurrence of Asbestosis Among Industrial Insulation Workers, 132 Ann. New York Acad.Sc. 139 (1965).

15. The authors state:
Among the asbestos insulation workers examined by us, evidence of pulmonary asbestosis was present in almost half the men examined. In this evaluation, radiological change has been used as the sole criteria. (See Table 5) We understand, of course, that evaluation of the presence and extent of asbestosis limited only to X-ray findings tends to result in underestimation of the incidence of asbestosis, but few instances of disabling disease will be so overlooked. Analysis of our data indicates that radiologically evident pulmonary asbestosis varied directly with the duration of exposure. Insulation workers with relatively short periods of exposure have a significantly lower incidence of pulmonary

asbestosis and this, when present, was generally of minimal extent.

Of 346 men whose exposure had begun less than ten years before examination, only 36 or 10.4 per cent showed any radiological abnormality. In each of these cases, the reticular infiltration was minimal in extent and in none was there evidence of pleural calcification. In only four was pleural fibrosis seen. Of 379 men whose exposure had begun from 10 to 19 years before examination, more than half still had normal X-rays. Some abnormality was seen on X-ray in 167 of these cases but in only nine was the asbestosis greater than minimal. In 35 of these men there was some pleural fibrosis and in five, evidence of calcification.

On the other hand, among the 392 men with more than 20 years elapsed from onset of exposure, the very large majority had X-ray evidence of pulmonary asbestosis. Among the 77 whose exposure began from 20 to 29 years prior to examination, 56 showed abnormal films. Among 194 whose examination took place from 30 to 39 years following onset of exposure, almost 9 of 10 showed abnormal films while, of those with more than 40 years from onset of exposure only one in 20 showed no abormality. Moreover, the asbestosis in these cases tended to be considerably more extensive and severe and pleural calcification and fibrosis were commonly seen.

TABLE 5

X–RAY CHANGES IN ASBESTOS INSULATION WORKERS

| Onset of exposure (yrs.) | No. | % Normal | % Abnormal | Asbestosis (grade) 1 | 2 | 3 |
|---|---|---|---|---|---|---|
| 40+ | 121 | 5.8 | 94.2 | 35 | 51 | 28 |
| 30–39 | 194 | 12.9 | 87.1 | 102 | 49 | 18 |
| 20–29 | 77 | 27.2 | 72.8 | 35 | 17 | 4 |
| 10–19 | 379 | 55.9 | 44.1 | 158 | 9 | 0 |
| 0–9 | 346 | 89.6 | 10.4 | 36 | 0 | 0 |
| | 1,117 | 51.5 | 48.5 | 366 | 126 | 50 |

Selikoff et al., supra note 15 at 147.

16. Recognition of the grave occupational health problem posed by asbestos and other toxic and physically harmful substances has led to the passage of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq., 84 Stat. 1590. The Act gives the Secretary of Labor the authority to establish standards for permissible concentrations of airborne asbestos fibers.

The plaintiff introduced evidence tending to establish that the defendant manufacturers either were, or should have been, fully aware of the many articles and studies on asbestosis. The evidence also indicated, however, that during Borel's working career no manufacturer ever warned contractors or insulation workers, including Borel, of the dangers associated with inhaling asbestos dust or informed them of the ACGIH's threshold limit values for exposure to asbestos dust. Furthermore, no manufacturer ever tested the effect of their products on the workers using them or attempted to discover whether the exposure of insulation workers to asbestos dust exceeded the suggested threshold limits.

On October 20, 1969, Borel initiated the present diversity action in the United States District Court for the Eastern District of Texas. Borel named as defendants eleven manufacturers of asbestos insulation materials used by him during his working career. He settled with four defendants before trial. The trial court instructed a verdict as to a fifth. The remaining defendants were: Fibreboard Paper Products Corporation, Johns-Manville Products Corporation, Pittsburgh Corning Corporation, Philip Carey Corporation, Armstrong Cork Corporation, and Ruberoid Corporation, a Division of GAF Corporation.[17] Borel died before trial and his widow was substituted as plaintiff under the Texas wrongful death statutes. Vernon's Ann.Tex.Rev.Civ.Stat. arts. 4671, 5525.

The plaintiff sought to hold the defendants liable for negligence, gross negligence, and breach of warranty or strict liability. The negligent acts alleged in the complaint were: (1) failure to take reasonable precautions or to exercise reasonable care to warn Borel of the danger to which he was exposed as a worker when using the defendants' asbestos insulation products; (2) failure to inform Borel as to what would be safe and sufficient wearing apparel and proper protective equipment and appliances or method of handling and using the various products; (3) failure to test the asbestos products in order to ascertain the dangers involved in their use; and (4) failure to remove the products from the market upon ascertaining that such products would cause asbestosis. The plaintiff also alleged that the defendants should be strictly liable in warranty and tort. The plaintiff contended that the defendants' products were unreasonably dangerous because of the failure to provide adequate warnings of the foreseeable dangers associated with them.

The defendants denied the allegations in the plaintiff's complaint and interposed the defenses of contributory negligence and assumption of risk.

The trial court submitted the case to the jury on general verdicts accompanied by a special interrogatory as to Borel's contributory negligence. As to the negligence count, the jury found that all the defendants, except Pittsburgh and Armstrong, were negligent but that none of the defendants had been grossly negligent. It found also, however, that Borel had been contributorily negligent.

As to the strict liability count, the jury found that all the defendants were liable and determined that the total damages were $79,436.24. Since four defendants originally named in the complaint had previously settled, paying a total of $20,902.20, the trial court gave full credit for the sums paid in settlement and held the remaining six defendants jointly and several liable for the balance of $58,534.04. The defendants appealed.

17. The original complaint also named as defendants Owens-Corning Fiberglass Corporation, Standard Asbestos Manufacturing and Insulating Company, Unarco Industries, Inc., Eagle-Picher Industries, Inc., and Combustion Engineering, Inc. The first four firms settled before trial. The trial court instructed a verdict in favor of Combustion Engineering, Inc., because the plaintiff had failed to show that he had ever been exposed to any product of that company.

## II.

At the outset, we meet the question whether the trial court properly instructed the jury on strict liability. Since federal jurisdiction is based on diversity of citizenship, the substantive law of the forum state, Texas, controls. Erie R. R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

Under Texas law, a manufacturer of a defective product may be liable to a user or consumer in either warranty or tort.[18] With respect to personal injuries caused by a defective product, the Texas Supreme Court has adopted the theory of strict liability in tort as expressed in section 402A of the Restatement (Second) of Torts (1964).[19] McKisson v. Sales Affiliates, Inc., 1967, 416 S.W.2d 787; Shamrock Fuel & Oil Sales Co. v. Tunks, 1967, 416 S.W.2d 779; Texsun Feed Yards, Inc. v. Ralston Purina Co., 5 Cir. 1971, 447 F.2d 660. Section 402A provides, in relevant part: "One who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is subject to liability for physical harm thereby caused to the ultimate consumer or user".

Under the Restatement, liability may not be imposed merely because a product involves some risk of harm or is not entirely safe for all uses. Products liability does not mean that a seller is an insurer for all harm resulting from the use of his product. Rather, a product is "defective" under the Restatement only if it is "unreasonably dangerous" to the ultimate user or consumer.[20] The requirement that the defect render the product "unreasonably dangerous" reflects a realization that many products have both utility and danger. The determination that a product is unreasonably dangerous, or not reasonably safe, means that, on balance, the utility of the product does not outweigh the magnitude of the danger. See Helene Curtis Industries, Inc. v. Pruitt, 5 Cir. 1967, 385 F.2d 841; James, Products Liability, 33 Tex.L.Rev. 114 (1955); Wade, Strict Tort Liability of Manufacturers, 19 S.W.L.J. 5, 15 (1965); Keeton, Products Liability-Inadequacy of Information, 48 Tex.L.Rev. 398, 403 (1970).

18. The Restatement (Second) of Torts and its Reporter at the time Section 402A was drafted, Professor Prosser, in his writings, treated breach of implied warranty not in the language of contractual warranty but in the language of strict liability in tort. See Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099, 1126–1127 (1960); Prosser, The Fall of the Citadel (Strict Liability to the Consumer), 50 Minn.L.Rev. 791, 804–05 (1966). Typically, in Greeno v. Clark Equipment Co., N.D.Ind.1965, 237 F.Supp. 427, 429, the court noted that strict liability in tort as imposed by section 402A of Restatement (Second) of Torts (1965) is "hardly more than what exists under implied warranty when stripped of the contract doctrines of privity, disclaimer, requirements of notice of defect, and limitation through inconsistencies with express warranties."

19. "§ 402A. Special liability of Seller of Product for Physical Harm to User or Consumer.
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

20. As used in the Restatement, "defective" means "unreasonably dangerous"; it has no independent significance. See Wade, Strict Tort Liability of Manufacturers, 19 S.W.L.J. 5, 14–15 (1965).

The fulcrum for this balancing process is the reasonable man as consumer or as seller. Thus, a product is unreasonably dangerous only when it is "dangerous to an extent beyond that contemplated by the ordinary consumer who purchases it". Restatement (Second) of Torts, § 402A, comment i. In other words, for a product to be unreasonably dangerous, "it must be so dangerous that a reasonable man would not sell the product if he knew the risk involved".[21] Helene Curtis Industries, Inc. v. Pruitt, 385 F.2d at 850. *See* Wade, *supra* at 15; Keeton, Products Liability—Liability Without Fault and the Requirement of a Defect, 41 Tex.L.Rev. 855, 859 (1963).

█ Here, the plaintiff alleged that the defendants' product was unreasonably dangerous because of the failure to give adequate warnings of the known or knowable dangers involved. As explained in comment j to section 402A, a seller has a responsibility to inform users and consumers of dangers which the seller either knows or should know at the time the product is sold. The requirement that the danger be reasonably foreseeable, or scientifically discoverable, is an important limitation of the seller's liability.[22] In general, "[t]he rule of strict liability subjects the seller to liability to the user or consumer even though he has exercised all possible care in the preparation and sale of the prod-uct". Section 402A, Comment a. This is not the case where the product is alleged to be unreasonably dangerous because of a failure to give adequate warnings. Rather, a seller is under a duty to warn of only those dangers that are reasonably foreseeable. The requirement of foreseeability coincides with the standard of due care in negligence cases in that a seller must exercise reasonable care and foresight to discover a danger in his product *and to warn users and consumers of that danger*. Davis v. Wyeth Laboratories, Inc., 9 Cir. 1968, 399 F.2d 121. *See* Basko v. Sterling Drug, Inc., 2 Cir. 1969, 416 F.2d 417, 427.

█ As the plaintiff has argued, insulation materials containing asbestos may be viewed as "unavoidably unsafe products". As explained in comment k to section 402A of the Restatement, "unavoidably unsafe products" are those which, in the present state of human knowledge, are incapable of being made safe for their ordinary and intended use. Strict liability may not always be appropriate in such cases because of the important benefits derived from the use of the product. This is especially so with respect to new drugs that are essential in treating disease but involve a high degree of risk.[23] It may also be so with respect to other commercial products possessing both unparalled utility and unquestioned danger. As a practical

---

21. The consumer-oriented standards in the Restatement is essentially identical to the seller-oriented standard in Helene Curtis Industries, Inc. v. Pruitt, *supra*. In Welch v. Outboard Marine Corp., 5 Cir. 1973, 481 F. 2d 252 [1973] we said:

> We see no necessary inconsistency between a seller-oriented standard and a user-oriented standard when, as here, each turns on foreseeable risks. They are two sides of the same standard. A product is defective and unreasonably dangerous when a reasonable seller would not sell the product if he knew of the risks involved or if the risks are greater than a reasonable buyer would expect. As Dean Wade has pointed out, since the test for imposing strict liability is whether the product was "not reasonably safe", this test characterizes the seller's or manufacturer's conduct as well as the product. If the defendant has actual or constructive knowledge of the condition of the product, it would be unreasonable for him to sell it. Wade, Strict Tort Liability of Manufacturers, 19 Sw.L.J. 5, 15 (1965).

22. Several commentators, including Dean Keeton, have argued that the seller should be strictly liable if the sale of the product is under circumstances that would subject someone to an unreasonable risk in fact. Under this standard, the fact that the maker was excusably unaware of the extent of the danger would be irrelevant. *See* Keeton, P., Inadequacy of Information, 48 Tex.L.Rev. 398, 404, 409 (1970).

23. *See* Merrill, Compensation for Prescription Drug Injuries, 59 Va.L.Rev. 1, 29–50 (1973); Keeton, P., Products Liability—Drugs and Cosmetics, 25 Vand.L.Rev. 131, 137 (1972).

matter, the decision to market such a product requires a balancing of the product's utility against its known or foreseeable danger. But, as comment k makes clear, even when such balancing leads to the conclusion that marketing is justified, the seller still has a responsibility to inform the user or consumer of the risk of harm. The failure to give adequate warnings in these circumstances renders the product unreasonably dangerous. See Alman Bros. Farm & Feed Mill, Inc. v. Diamond Lab. Inc., 5 Cir. 1971, 437 F.2d 1295; Davis v. Wyeth Laboratories, Inc., 9 Cir. 1968, 399 F.2d 121; Basko v. Sterling Drug, Inc., 2 Cir. 1969, 416 F.2d 417; Sterling Drug, Inc. v. Yarrow, 8 Cir. 1969, 408 F.2d 978; Sterling Drug v. Cornish, 8 Cir. 1966, 370 F.2d 82. The rationale for this rule is that the user or consumer is entitled to make his own choice as to whether the product's utility or benefits justify exposing himself to the risk of harm. Thus, a true choice situation arises, and a duty to warn attaches, whenever a reasonable man would want to be informed of the risk in order to decide whether to expose himself to it.

In Davis v. Wyeth Laboratories, Inc., for example, the defendant manufacturer sold polio vaccine without warning of the statistical risk that one person in a million would contract polio by taking the vaccine. The court held that the manufacturer had a duty to warn the consumer of the risks involved and that the failure to meet this duty rendered the drug "unfit" and "unreasonably dangerous" within the meaning of section 402A. The court stated:

> In such cases, then, the drug is fit and its danger is reasonable only if the balance is struck in favor of its use. Where the risk is otherwise known to the consumer, no problem is presented, since choice is available. Where not known, however, the drug can properly be marketed only in such fashion as to permit the striking of the balance; that is, by full disclosure of the existence and extent of the risk involved.

\* \* \* \* \* \*

There will, of course, be cases where the personal risk, although existent and known, is so trifling in comparison with the advantage to be gained as to be de minimis. Appellee so characterizes this case. It would approach the problem from a purely statistical point of view: less than one out of a million is just not unreasonable. This approach we reject. When, in a particular case, the risk qualitatively (e. g., of death or major disability) as well as quantitatively, on balance with the end sought to be achieved, is such as to call for a true choice judgment, medical or professional, the warning must be given.

399 F.2d at 129–130.

So it is with the case at bar. The utility of an insulation product containing asbestos may outweigh the known or foreseeable risk to the insulation workers and thus justify its marketing. The product could still be unreasonably dangerous, however, if unaccompanied by adequate warnings. An insulation worker, no less than any other product user, has a right to decide whether to expose himself to the risk.

Furthermore, in cases such as the instant case, the manufacturer is held to the knowledge and skill of an expert. This is relevant in determining (1) whether the manufacturer knew or should have known the danger, and (2) whether the manufacturer was negligent in failing to communicate this superior knowledge to the user or consumer of its product. Wright v. Carter Products, Inc., 2 Cir. 1957, 244 F.2d 53. The manufacturer's status as expert means that at a minimum he must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby.[24] But even more im-

---

24. *See* Keeton, Product Liability—Problems Pertaining to Proof of Negligence, 19 S.W.L.J. 26, 30–33 (1965).

portantly, a manufacturer has a duty to test and inspect his product.[25] The extent of research and experiment must be commensurate with the dangers involved. A product must not be made available to the public without disclosure of those dangers that the application of reasonable foresight would reveal. Nor may a manufacturer rely unquestioningly on others to sound the hue and cry concerning a danger in its product. Rather, each manufacturer must bear the burden of showing that its own conduct was proportionate to the scope of its duty.

We now turn to the charge in the present case and the defendants objections to it. The trial judge instructed the jury in terms of both breach of warranty and strict liability in tort. He stated that strict liability could be imposed only if the product was unreasonably dangerous to the user or consumer at the time it was sold. He defined "unreasonably dangerous" as dangerous to an extent "beyond that contemplated by [an] insulation contractor or insulator [i. e. asbestos insulation worker] with knowledge available to them as to the characteristics of the product". Furthermore, the court stated that the danger "must have been reasonably foreseen by the manufacturer" and that the product's unreasonably dangerous condition must have been the proximate cause of Borel's injury.[26]

---

25. *See* 1 Frumer & Friedman, Products Liability, § 6.01 [1] and cases cited; Noel, Manufacturer's Negligence of Design or Directions for Use of a Product, 71 Yale L. J. 816, 853 (1962). *See also* Roginsky v. Richardson-Merrell, Inc., 2 Cir. 1967, 378 F.2d 832; Tinnerholm v. Parke-Davis & Co., S.D.N.Y.1968, 285 F.Supp. 432, aff'd, 411 F.2d 48; Schenebeck v. Sterling Drug, Inc., D.D.Ark.1968, 291 F.Supp. 368.

26. The trial court stated, in part:

Now, turning our attention to the matter of the defenses of the defendants in connection with the implied warranty or strict liability, you are charged that if there is any unreasonable risk or danger from using defendants' products containing asbestos, which risk or danger must be the risk or danger beyond that which would be contemplated by insulation contractor or insulator with the knowledge available to them as to characteristics of the product, such unreasonable risk or danger from using defendants' product must have been reasonably foreseen by the manufacturer. Therefore, if you find from a preponderance of the evidence that Mr. Borel came in contact with the defendants' product and developed asbestosis thereafter and at such time of contact, the product containing asbestos manufactured by the defendant and that the danger of the use of the said asbestos products by Mr. Borel could not have been reasonably foreseen by the manufacturer, then there could be no proximate cause and your verdict would be for the defendants. In other words, there would be no proximate

cause of the breach of the warranty or strict liability that would justify your finding in favor of the plaintiff, but you would have to find for the defendants. Also, in connection with the implied warranty theory, you are instructed that the burden of proof is on the plaintiff in this case. Before they are entitled to recover any damages against any of the defendants to establish by a preponderance of the evidence that the product sold by the particular defendant or defendants was defective at the time it was sold. Before a product can be found to be defective it must establish that it was unreasonably dangerous to the user of consumer at the time it was sold. You are further instructed that the burden of proof is on the plaintiff to establish also by a preponderance of the evidence not only that the product was defective but also that the defect in the product was a proximate cause of the death of Clarence Borel.

By the term DEFECTIVE as used in this charge is meant a condition not contemplated by the insulator, contractor or ultimate user. Accordingly, you are instructed that in the event plaintiff has failed to prove by a preponderance of the evidence the existence of a defect in the product at which time the product was sold and that such defect was the proximate cause of the death of Clarence Borel, then you cannot find for the plaintiff on the theory of breach of implied warranty or strict liability and you must return a verdict against the plaintiff and in favor of the defendants.

The defendants first object to the court's use of breach of warranty language in some parts of the charge. It is argued that such terms as "unmerchantable", and "unfit for ordinary purposes" may have led the jury to believe that liability could be imposed simply because the product caused harm in its ordinary and intended use.

■ Although we agree that a reference to "breach of warranty" in a products liability charge may be unnecessarily confusing in some cases, since that is the language of contracts not torts, we are persuaded that no prejudice resulted to the defendants from its use in this case. Consistent with Shamrock Fuel & Oil Sales v. Tunks, the trial court accurately instructed the jury on strict liability in tort as defined in section 402A of the Restatement. With respect to breach of implied warranty, the court specifically equated "unfitness" or "unmerchantability" with the "unreasonably dangerous" standard of strict liability in tort.[27] Viewing the charge as a whole, we think that the jury fully understood that liability could be imposed only if the product was unreasonably dangerous.

■ The defendants also contend that the trial court erred in refusing to instruct the jury that liability could not be imposed if the utility of the product outweighed the danger involved. The trial court, however, did tell the jury that liability could not be imposed unless the product was "unreasonably dangerous," a concept that necessarily implies a balancing of a product's utility against the danger. Furthermore, as we noted earlier, even when such a balancing leads to the conclusion that marketing is justified, the seller still has a responsibility to inform the user or consumer of the risk. The failure to give adequate warnings in such circumstances can ren-

der the product unreasonably dangerous. See Restatement (Second) of Torts, § 402A, comment k; Davis v. Wyeth Laboratories, Inc. That was precisely the contention of the plaintiff in this case. We therefore find no error.

■ The defendants next contend that it was error for the trial court to imply that the defendants had an independent duty to test their product. As we have made clear, however, the manufacturer's duty to test his product is well-established.[28]

■ Finally, the defendants contend that the district court erred in refusing to instruct the jury that a product cannot be unreasonably dangerous if it conforms to the reasonable expectations of the industrial purchasers, here, the insulation contractors. The defendants assert, in effect, that it is the responsibility of the insulation contractors, not the manufacturers, to warn insulation workers of the risk of harm. We reject this argument. We agree with the Restatement: a seller may be liable to the *ultimate* consumer or user for failure to give adequate warnings. The seller's warning must be reasonably calculated to reach such persons and the presence of an intermediate party will not by itself relieve the seller of this duty. Sterling Drug Co. v. Cornish, 8 Cir. 1966, 370 F.2d 82; Yarrow v. Sterling Drug, 8 Cir. 1969, 408 F.2d 978; Noel, Products Defective Because of Inadequate Directions or Warnings, 23 S.W.L.J. 256 (1969). In general, of course, a manufacturer is not liable for miscarriages in the communication process that are not attributable to his failure to warn or the adequacy of the warning. This may occur, for example, where some intermediate party is notified of the danger, or discovers it for himself, and proceeds deliberately to ignore it and to pass on the product with-

---

27. Breach of warranty cases invariably speak in terms of fitness for the particular purposes for which the products were sold. This formulation parallels the "unreasonably dangerous" rule applied in strict liability in tort cases. *See* Lartigue v. R. J. Reynolds

Tobacco Co., 5 Cir. 1963, 317 F.2d 19, 37; Greenman v. Yuba Power Prods., Inc., Cal. Sup.Ct.1963, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897.

28. *See* footnote 25.

out a warning.[29] But there is nothing in the trial court's charge in the present case to imply that the seller or manufacturer would be liable in such a situation. To the contrary, the trial court fully instructed the jury that the defect rendering the product unreasonably dangerous must be the proximate cause of the plaintiff's injury.

We conclude, therefore, that the trial court did not err in instructing the jury on strict liability.

### III.

We now turn to the question whether the trial court erred in denying the defendants' motions for a directed verdict and for judgment notwithstanding the verdict. In diversity cases, a federal rather than a state test is applied to determine whether there was sufficient evidence to create a jury question. Planters Manufacturing Co. v. Protection Mut. Ins. Co., 5 Cir. 1967, 380 F.2d 869; Helene Curtis Industries, Inc. v. Pruitt, 5 Cir. 1967, 385 F.2d 841. In Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365, 374, we defined the test as follows:

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just the evidence that supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality that reasonable and fair-minded men in the exercise of impartial judgment might reach different con-

clusions, the motions should be denied and the case submitted to the jury.

An appellate court, of course, must scrupulously avoid usurping the function of the jury by weighing conflicting evidence and inferences or by judging the credibility of witnesses and then arriving at its own conclusion concerning the merits of the parties' contentions. Rather, our task is limited to determining whether there is a conflict in substantial evidence sufficient to create a jury question.

A. First, we approach the question whether the danger to Borel and other insulation workers was foreseeable at the time the products causing Borel's injury were sold. The defendants' position is that they did not breach their duty to warn because the danger from inhaling asbestos was not foreseeable until about 1968 and that, in view of the long latent period of the disease, Borel must have contracted asbestosis well before that date.

To begin, we note that the disease of asbestosis is cumulative. Thus, both Borel's earliest exposure to asbestos dust, occurring in the late 1930's, and his most recent exposure, occurring in 1968, could have contributed to his overall condition. The defendants' failure to warn of the dangers of the exposures occurring in 1968 may have resulted in an actionable injury to Borel. But even if it is assumed that Borel's condition was attributable principally to his earlier exposures, the defendants argument still fails since there is ample evidence in the record that the danger of inhaling asbestos, including the disease of asbestosis, was widely recognized at least as early as the 1930's. An expert witness, Dr. Hans Weill, testified that prior to 1935 there were literally "dozens and dozens" of articles on asbestos and its effect on man. Dr. Clark Cooper, an expert witness for the defendants, stated

---

29. See Prosser. The Fall of the Citadel, (strict Liability to the Consumer), 50 Minn. L.Rev. 791, 826–828 (1966). Where a product is extremely dangerous, however, the seller or manufacturer cannot rely upon the intermediate party to transmit a warning. See Prosser, id.; Noel, Products Defective Because of Inadequate Directions or Warnings, 23 S.W.L.J. 256 (1969).

that it was known in the 1930's that inhaling asbestos dust caused asbestosis and that the danger could be controlled by maintaining a modest level of exposure. Dr. Cooper testified as follows:

"Q. The state of knowledge in the 1930's, let's say, in your opinion was asbestosis as a disease known about and recognized as a danger caused by inhaling asbestos dust?

"A. Yes.

"Q. And would you say that would have been rather common knowledge known in the 1930's?

"A. Yes, I would say that. The answer to that would be yes."

As stated in our recital of the facts, several studies published during the 1930's and 1940's reported the danger to asbestos plant workers and others exposed to asbestos dust and urged precautionary measures to eliminate hazardous concentrations. The American Conference of Governmental Industrial Hygienists, beginning in 1947, issued guidelines suggesting threshold limit values for exposure to asbestos dust. Even the Fleischer-Drinker report in 1945, relied on by the defendants, cautioned that exposure to high concentrations of asbestos dust could cause asbestosis and recommended the use of ventilation and respiratory protection devices.

The evidence also tended to establish that none of the defendants ever tested its product to determine its effect on industrial insulation workers. Nor did any defendant ever attempt to determine whether the exposure of insulation workers or others to asbestos dust exceeded the A. C. G. I. H.'s recommended threshold limit values, or indeed, whether those standards were accurate or reliable.

■ As previously mentioned, the foreseeability of the danger must be measured in light of the manufacturer's status as an expert and the manufacturer's duty to test its product. In these circumstances, we think the jury was entitled to find that the danger to Borel and other insulation workers from inhaling asbestos dust was foreseeable to the defendants at the time the products causing Borel's injuries were sold.

■ The defendants next challenge the jury's finding that their products were unreasonably dangerous for failure to give warnings. They cannot deny, however, that once the danger became foreseeable, the duty to warn attached. Davis v. Wyeth Laboratories, Inc. Here, the defendants gave no warning at all. They attempt to circumvent this finding by arguing, disingenuously, that the danger was obvious. For present purposes, it is sufficient to note that Borel testified that he did not know that inhaling asbestos dust could cause serious illness until his doctors advised him in 1969 that he had asbestosis. Furthermore, we cannot say that, as a matter of law, the danger was sufficiently obvious to asbestos installation workers to relieve the defendants of the duty to warn.

The jury found that the unreasonably dangerous condition of the defendants' product was the proximate cause of Borel's injury. This necessarily included a finding that, had adequate warnings been provided, Borel would have chosen to avoid the danger. Davis v. Wyeth Laboratories, Inc.; Charles Pfizer & Co. v. Branch, Tex.Civ.App.1963, 365 S.W.2d 832.

■ B. Two defendants, Pittsburgh and Armstrong, argue that, as to them, the jury's finding of strict liability cannot stand because it is inconsistent with the jury's finding in a separate general verdict that they were not negligent. As previously discussed, when a failure to give adequate warning is alleged to have made a product unreasonably dangerous, the standard for strict liability is essentially similar to the standard for establishing negligence: the seller or manufacturer has a duty to warn of foreseeable dangers. In the present case, the plaintiff sought to recover on the basis of both negligence and strict liability in warranty and tort. The trial court submitted the case to the

jury in the form of two general verdicts accompanied by a special interrogatory on contributory negligence. On the negligence count, the jury found that Pittsburgh and Armstrong were not negligent in failing to warn of a foreseeable danger, and on the strict liability count, that their products were unreasonably dangerous because of the failure to warn of the same danger.

This inconsistency in the jury's verdicts, although puzzling, need not detain us. It has long been the rule that consistency in general verdicts is not required. Dunn v. United States, 1932, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356. "Whether the jury's verdict was the result of carelessness or compromise or a belief that the responsible individual should suffer the penalty . . . is immaterial. Juries may indulge in precisely such motives or vagaries." United States v. Dotterweich, 1943, 320 U.S. 277, 279, 64 S.Ct. 134, 135, 88 L.Ed. 48. Thus, even if the general verdicts are internally inconsistent, such is the jury's prerogative if, as we have found, there is evidence to support the finding reached by the jury.

C. We next consider whether there was substantial evidence to support the jury's finding that each defendant was the cause in fact of injury to Borel. The traditional rule is that a defendant's conduct is the cause of the event if it was a substantial factor in bringing it about. Prosser, Law of Torts § 41 at 240 (3ed. 1971); Second Restatement of Torts, §§ 431, 433, Malone, Ruminations on Cause-in-Fact 9 Stan.L.Rev. 60 (1956); Green, The Causal Relation Issue, 60 Mich.L.Rev. 543 (1962). Whether the defendant's conduct was a substantial factor is a question for the jury, unless the court determines that reasonable men could not differ.

In the instant case, it is impossible, as a practical matter, to determine with absolute certainty which particular exposure to asbestos dust resulted in injury to Borel. It is undisputed, however, that Borel contracted asbestosis from inhaling asbestos dust and that he was exposed to the products of all the defendants on many occasions. It was also established that the effect of exposure to asbestos dust is cumulative, that is, each exposure may result in an additional and separate injury. We think, therefore, that on the basis of strong circumstantial evidence the jury could find that each defendant was the cause in fact of some injury to Borel.

Relying on expert testimony that asbestosis does not usually manifest itself until fifteen, twenty, or even twenty-five years after initial exposure, Pittsburgh Corning Company and Armstrong Cork Company contend that they cannot be liable because Borel was not exposed to their products until after 1962 and 1966 respectively. As we have pointed out, however, the length of this latent period varies according to individual idiosyncracy, duration and intensity of exposure, and the type of asbestos used; in some cases the effect of the exposure may manifest itself in less than five or ten years. Thus, even the most recent exposures could have added to or accelerated Borel's overall condition.

## IV.

Having concluded that each defendant was the cause in fact of some injury to Borel, we now come to the question of apportionment of damages. In general, a defendant is liable only for that portion of the harm which he in fact caused. A problem arises, however, where, as here, several causes combine to produce an injury that is not reasonably capable of being divided. In the instant case, the trial court resolved this issue by holding the defendants jointly and severally liable for the entire harm. Asserting error, the defendants argue that if the injury cannot be reasonably apportioned, the plaintiff must bear the entire loss unless it can be shown that the tortfeasors acted in concert or with unity of design.

The defendants' argument is best illustrated by Sun Oil v. Robicheaux,

Tex.Civ.App.1930, 23 S.W.2d 713, a case in which several defendants, acting independently, were polluting a bayou from which the plaintiff was taking water for irrigation. The court held that an action at law for damages could not be maintained jointly against the defendants and that each was liable only for the part of the injury which he caused. The court stated:

> Under such circumstances each tortfeasor is liable only for the part of the injury or damages caused by his own wrong; that is, where a person contributes to an injury along with others, he must respond in damages, but if he acts independently, and not in concert of action with other persons in causing such injury, he is liable only for the damages which directly and proximately result from his own act, and the fact that it may be difficult to define the damages caused by the wrongful act of each person who independently contributed to the final result does not affect the rule.

23 S.W.2d at 715.

The effect of the *Robicheaux* rule was to make it impossible to join several wrongdoers whose independent acts caused an injury which, although theoretically divisible, was indivisible as a practical matter. The burden was placed on the plaintiff to prove with reasonable certainty what portion of the total damage was attributable to each defendant. Failing that, recovery would be denied even though it was undisputed that each defendant caused some harm.

In 1952, the *Robicheaux* case was expressly overruled by the Texas Supreme Court in Landers v. East Texas Salt Water Disposal Co., 151 Tex. 251, 248 S.W.2d 731.[30] In that case, an oil company and a salt water disposal company each owned pipe lines running near the plaintiff's land. At about the same time, each pipe line broke, pouring oil and salt water onto the plaintiff's land and into his lake. The plaintiff sought to hold the defendants liable for the entire harm. In upholding the joinder of the two defendants, the court noted that prior cases "seem to have embraced the philosophy . . . that it is better that the injured party lose all of his damages than that any of the several wrongdoers pay more of the damages than he individually and separately caused. If such has been the law, than from the standpoint of justice it should not have been; if it is now, it will not be hereafter". 248 S.W.2d at 734. The court then announced the new rule:

> Where the tortious acts of two or more wrongdoers join to produce an indivisible injury, that is, an injury which from its nature cannot be apportioned with reasonable certainty to the individual wrongdoers, all of the wrongdoers will be held jointly and severally liable for the entire damages and the injured party may proceed to judgment against any one separately or against all in one suit. *Id.*

The effect of the *Landers* case may be stated as follows: Where several defendants are shown to have each caused some harm, the burden of proof (or burden of going forward) shifts to each defendant to show what portion of the harm he caused. If the defendants are unable to show any reasonable basis for division, they are jointly and severally liable for the total damages.[31]

The defendants attempt to distinguish *Landers* by asserting that it applies only to situations where the tortious acts occur simultaneously. As the court noted in *Landers,* however, there was no allegation in the plaintiff's complaint that the defendants tortious acts occurred at the same time. The court specifically refused to limit its holding to cases in which "the negligence of the wrongdoers contributing to the injury was operating

---

30. *See* Note, 31 N.C.L.Rev. 237 (1953); 31 Texas L.Rev. 226 (1953).

31. *See* Prosser, Law of Torts, § 52 at 319–320 (4 ed. 1971). Professor Wigmore suggested a similar rule long ago. *See* Wigmore, 17 Ill.L.Rev. 458 (1923).

simultaneously". 248 S.W.2d at 735. Later Texas cases have also applied the Landers rule to non-simultaneous tortious acts.[32] *See* Continental Elec. Mfg. Co. v. Navajo Freight Lines, Inc., 5 Cir. 1971, 447 F.2d 1174.

■ Applying these principles to the present case, we conclude that the defendants may be held jointly and severally liable for the total damages.

## V.

We now turn to a consideration of the defensive issues raised in the trial court's charge. The principal issue on appeal is whether the trial court properly instructed the jury as to which forms of contributory negligence or assumption of risk are defenses to a strict liability action. The defendants contend that the plaintiff's recovery should have been barred by both the doctrine of *volenti non fit injuria* and contributory negligence. In brief, it is argued that Borel assumed the risk when he continued in his employment as an insulator after he knew and appreciated the danger from the defendants' product.[33]

■ *Volenti non fit injuria* an ancient maximum meaning that no wrong is done to one who consents, is essentially a form of assumption of risk. Under Texas law, the *volenti* doctrine has four elements: (1) the plaintiff knows the facts constituting a dangerous condition; (2) he knows the condition or activity to be dangerous; (3) he appreciates the nature or extent of the danger; and (4) he voluntarily exposes himself to the danger. Halepeska v. Callihan Interests, Inc., Tex.Sup.1963,

371 S.W.2d 368. Texas courts have held that *volenti* is a subjective standard: the plaintiff must know, understand, and appreciate the danger, and consent to expose himself to it. J. & W. Corp. Inc. v. Ball, Tex.Sup.Ct.1967, 414 S.W.2d 143.

■ In its most traditional form, contributory negligence consists of the plaintiff's failure to exercise the care of a reasonable person for his own protection. It may overlap with *volenti* in situations where the plaintiff has been contributorily negligent in proceeding to encounter an unreasonable risk. This form of contributory negligence differs from *volenti* in two respects. First, contributory negligence is an objective rather than a subjective standard. The plaintiff is required to have the knowledge, understanding, and judgment of an ordinary reasonable man and must exercise due care to discover and understand the defect or danger. Second, justification, in terms of the reasonableness of the plaintiff's conduct, is an important element. The plaintiff is not contributorily negligent unless his conduct in encountering the danger was unreasonable. Thus, unlike *volenti*, the contributory negligence doctrine requires a balancing of the utility of the plaintiff's conduct against the magnitude of the danger. *See generally,* (Second) Restatement of Torts, §§ 463, 466 (1964); Restatement (Second) of Torts, §§ 496A–G (Tent. Draft No. 9, 1963).

Another form of contributory negligence consists of voluntary and unreasonable conduct in encountering a known risk. As found in comment n to section 402A of the Restatement,[34] it represents

---

32. *See, e. g.,* Riley v. Industrial Finance Service, 1957, 302 S.W.2d 652; Kirby Lumber Corp. v. Walters, Tex.Civ.App.1955, 277 S.W.2d 796.

33. For a discussion of this topic, *see* Noel, Abnormal Use, Contributory Negligence, and Assumption of Risk, 25 Vand.L.Rev. '93 (1972); Epstein, Products Liability: Defenses Based on Plaintiff's Conduct, 1968 Utah L.Rev. 267; Keeton, Assumption of Product Risk, 19 S.W.L.J. 61 (1965); Greenhill, Assumption of Risk, 16 Baylor L.

Rev. 111 (1964); Keeton, Assumption of Risk and the Landowner, 22 La.L.Rev. 108 (1961); Keeton, Assumption of Risk in Products Liability Cases, 22 La.L.Rev. 122 (1961).

34. Section 402A of the Second Restatement of Torts states, in part:
 n. *Contributory negligence.* Since the liability with which this Section deals is not based upon negligence of the seller, but is strict liability, the rule applied to strict liability cases (see § 524) applies.

a hybridization of *volenti* and traditional contributory negligence. Applying a subjective standard, the jury must find the first three elements of *volenti*: the plaintiff must have had actual knowledge, understanding, and appreciation of the danger. With respect to voluntariness, however, the jury must find that the plaintiff's action was both voluntary from a subjective standpoint and unreasonable from an objective standpoint.

The applicability of a *volenti* or contributory negligence defense to a strict liability action is unclear under Texas law. The leading Texas decision concerning the strict liability action is Shamrock Fuel & Oil Sales v. Tunks, Tex.Sup.Ct.1967, 416 S.W.2d 779. In that case, the plaintiff sought damages for injuries sustained while using adulterated kerosene. The defendants asserted that recovery should be denied because of the plaintiff's contributory negligence in failing to discover the dangerous nature of the adulterated kerosene or to guard against the possibility of its existence. Following in part the position taken in comment n to section 402A of the Restatement,[35] the Texas Supreme Court held that such negligence was not a defense to a strict liability action.

Later Texas decisions have re-affirmed the holding in *Shamrock* but have left unanswered what other forms of contributory negligence, assumption of risk, or *volenti* are a defense to a strict liability action. *See* McKisson v. Sales Affiliates, Inc. Our *Erie* ruminations in Messick v. General Motors Corp., 5 Cir. 1972, 460 F.2d 485, however, have led us to predict that Texas will adopt the position taken in comment n to section 402A of the Restatement that contributory negligence or assumption of risk is a defense to a strict liability action only when it consists of a voluntary and unreasonable conduct to encounter a known risk. In *Messick*, the plaintiff continued to drive his new car even after a private mechanic told him that its defective steering and suspension systems would cause his death. When the car later ran off the road, the plaintiff sued the manufacturer to recover damages for personal injuries sustained in the accident. The plaintiff alleged that the defendant was strictly liable because the car's defects rendered it unreasonably dangerous. After the jury returned a verdict in the plaintiff's favor, the defendant appealed, arguing that *volenti* was established as a matter

> Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.

35. The Court also quoted Dean Prosser with approval:

> "There has been ostensible, and quite superficial, disagreement over whether contributory negligence is available as a defense where the action is one for breach of warranty. A few decisions have said flatly that it is not. The greater number have said quite as flatly that it is. The

> conflict is, however, more apparent than real. If the cases are examined, it readily appears that those which refuse to allow the defense have been cases in which the plaintiff negligently failed to discover the defect in the product, or to guard against the possibility of its existence. They are entirely consistent with the general rule that such negligence is not a defense to an action founded upon strict liability. Those which have permitted the defense all have been cases in which the plaintiff has discovered the defect and the danger, and has proceeded nevertheless to make use of the product. They represent the form of contributory negligence which consists of deliberately and unreasonably proceeding to encounter a known danger, and overlaps assumption of risk. They are quite consistent with the general rule that this is a defense to strict liability. There are only a few cases which have recognized the distinction; but it seems quite clear that it is made in fact." (Prosser Law of Torts [3 ed.] 656).

416 S.W.2d at 783.

of law by the plaintiff's voluntary decision to continue using the car. In affirming, this Court held that continued use of a product known to be defective is a defense to a strict liability action only when the continued use is unreasonable. The court stated: "The limits of a manufacturer's liability for releasing a defective and unreasonably dangerous product in the *volenti* area are that the plaintiff's consent to incur the risk has been voluntarily given and is objectively unreasonable. The plaintiff at bar was entitled to go to the jury with the question of whether his consent was voluntary or was the product of duress of circumstances and unreasonable." 460 F.2d at 494.

We now turn to the trial court's instructions in the present case. The trial court, in informing the jury that assumption of risk was a defense to a strict liability action, stated as follows:

> [T]he defendants contend that the deceased, Mr. Borel, knew of the dangerous nature of the asbestos product manufactured by the defendants in connection with his insulation work and appreciated the danger and with such knowledge voluntarily assumed the risk by continuing his employment. Further, that this knowledge of the danger of the insulation was known to Mr. Borel's contractor or employer. Therefore, the Court would instruct you that if you find from a preponderance of the evidence that the deceased knew of the dangerous nature of the asbestos products with which he was working and appreciated the danger of working with such products or that he had knowledge through his contractor of the dangerous nature of the product and that he assumed the risk by continuing his work, then you would find against the plaintiff and in favor of the defendants.

■ In effect, the trial court instructed the jury that *volenti*, consisting of voluntary conduct in encountering a known and appreciated danger, is a defense to a strict liability action. This was error since, as we have held, contributory negligence or assumption of risk is a defense to a strict liability action only if the plaintiff's conduct is both voluntary *and* unreasonable. Messick v. General Motors Corp., *supra;* Restatement (Second) of Torts, § 402A, comment (n); Prosser, Law of Torts, § 102. The trial court's charge was overly favorable to the defendants. Despite this error, the jury still found that Borel had not assumed the risk even under the harsh *volenti* doctrine. Reversal of the jury's verdict, therefore, is not required.

The defendants contend, however, that they are entitled to judgment as a matter of law even if the Restatement standard had been correctly applied. We disagree. There is strong evidence in the record that Borel never actually knew or appreciated the extent of the danger involved. Borel testified that he never realized that inhaling asbestos dust could cause serious illness until his doctors first diagnosed his condition as asbestosis in 1969. Nor can we say that the danger was so obvious that Borel should be charged with knowledge as a matter of law. Halepeska v. Callihan Interests, Inc., *supra;* Schiller v. Rice, Tex.Sup.1952, 151 Tex. 116, 246 S.W.2d 607. Furthermore, there was evidence that Borel's decision to continue in his employment was neither voluntary nor unreasonable. Messick v. General Motors Corp., *supra.* In these circumstances, we find no cause to invade the province of the jury.

We next consider whether the trial court erred in instructing the jury that none of the alleged acts of contributory negligence was a defense to a strict liability action. The court described the acts of contributory negligence as follows:

> In this connection, the defendants contend that the deceased was negligent in failing to use a mask and respirator for protection from dust containing some asbestos; in failing to request his employer to furnish blowers to remove dust laden air; in working

in asbestos dust laden air with full knowledge that he was inhaling such dust laden air; in continuing to work with insulation material containing some asbestos after he knew or in the exercise of ordinary care should have known that it was affecting his health.

The defendants assert that Borel's allegedly negligent failure to wear a respirator constituted a misuse of the product that bars recovery.

"Misuse" involves a use of the product in a manner not reasonably foreseeable by the seller or manufacturer.[36] The most common form of misuse is a failure to follow adequate directions or warnings accompanying the product. In Proctor & Gamble Manufacturing Co. v. Langley, Tex.Civ.App.1967, 422 S.W. 2d 773, for example, the plaintiff read and understood the instructions accompanying a home permanent hair wave product but nevertheless failed to follow them in several important respects. When injury resulted, the plaintiff sued the manufacturer, the wholesale distributor, and the retail seller for breach of implied warranty. The court held that the plaintiff's violation of the plain instructions and warnings was a misuse of the product and constituted a defense to her cause of action. On rehearing, the court stated:

> We do not believe that the strict liability doctrine means [that] . . . a consumer may knowingly violate the plain, unambiguous instructions and ignore the warnings, then hold the makers, distributors and sellers of a product liable in the face of the obvious misuse of the product. Appellees brought their suit on the theory of implied warranty. We agree that the product carried an implied warranty of fitness, but such warranty existed only if the product was used in accordance with directions. The implied warranty did not apply when the product was misused, as it undis-

putedly was in this case. 422 S.W.2d at 780.

Similarly, in McDevitt v. Standard Oil Co. of Texas, 1968, 391 F.2d 364, the plaintiff sued an automobile tire retailer to recover damages for injuries sustained when his automobile tires failed and the car left the road. There was evidence that the plaintiff was provided with manufacturer's instructions regarding proper tire size but that he purchased an improper size. In addition, the record indicated that the vehicle was driven with air pressure in the tires at times well above, and at times well below, the recommended pressure as set out in the published manuals. There was also evidence that the vehicle was driven at excessive speeds and over rough terrain. The court, construing Texas law, held that the plaintiff's actions constituted a misuse of the product and was a defense to a strict liability action.

In the case at bar, we are not confronted with a failure to follow adequate instructions or warnings. Indeed, the evidence tended to establish that the defendants gave no instructions or warnings at all. They never suggested that respirators should be worn by insulation workers or provided any other directions as to the product's use. Nor are we confronted with any other type of conduct that was not reasonably foreseeable by the defendant manufacturers. From all that appears, Borel used the defendants' product exactly for its intended purpose. Rather, the defendants allege merely that Borel was contributorily negligent in failing to use a respirator. This form of contributory negligence amounts to a failure to discover a defect in the product or to guard against the possibility of its existence and is not a defense to a strict liability action. Shamrock Fuel & Oil Sales v. Tunks, McKisson v. Sales Affiliates, Inc. We therefore find no error in the trial court's charge.

---

36. *See* Noel, note 32 *supra*.

■ The defendants also assert that the trial court's instructions to the jury were confusing and ambiguous in some parts. The trial court's charge must be read as a whole and not as if each sentence were a solitary verbal phenomenon existing in an otherwise empty vacuum. The test is not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues. Gearhart v. WSAZ, Inc., 1957 E. D.Ky., 150 F.Supp. 98, aff'd 254 F.2d 242; Miller v. Pacific Mut. Life Ins. Co., D.C.Mich.1955, 17 F.R.D. 121, aff'd 228 F.2d 889. On reading the trial court's charge in this case, we find that it meets that standard.

■ The defendants further complain because the trial court refused to submit special interrogatories to the jury on several issues, including assumption of risk, but instead submitted the case on a general verdict. Rule 49 of the Federal Rules of Civil Procedure, however, gives the trial court wide discretion in determining the wording and form of verdicts. In the present case, we cannot say that the trial court abused its discretion. *See* Car v. General Ins. Corp., 5 Cir. 1947, 159 F.2d 985; De Eugenio v. Allis-Chalmers Mfg. Co., 3 Cir. 1954, 210 F.2d 409; Texas & P. Ry. Co. v. Griffen, 5 Cir. 1959, 265 F.2d 489.

### VI.

We are next met with the contentions that Borel's action is barred by the statute of limitations. The record shows that Borel filed a claim under the Texas Workmen's Compensation Act,[37] Tex.Civ. Stat. art. 8307 et seq., on January 17, 1969. After the Industrial Accident Board approved a settlement award on July 31, 1969, Borel filed the present damage action on October 20, 1969. Under Texas law, an action for personal injuries must be commenced and prosecuted within two years after the cause of action accrued. Tex.Civ.Stat. art. 5526. The defendant's position is that a cause of action accrues at the time of the injury and that the only effect of filing a claim under the Workmen's Compensation Act is to toll the statute of limitations until the Board issues a final order approving the award. The plaintiff, on the other hand, contends that when an injured employee successfully pursues his remedy for compensation under the Act, the statute of limitations for his damage action against a third party (that is, a party other than his employer) does not begin to run until the Board issues its final order.

The Texas Supreme Court considered this issue in Campbell v. Sonford Chemical Co., 1972, 486 S.W.2d 932. In that case, the employee, Campbell, filed a damage action on May 15, 1969, against a third party, Sonford, for personal injuries sustained in the fall and winter of 1964 and the spring of 1965. The compensation carrier for Campbell's employer intervened in order to exercise its subrogation rights under the Act for amounts previously paid to Campbell. Sonford moved for summary judgment on the ground that the action was

---

37. The Texas Workmen's Compensation Act operates in the following manner. Where a party other than the employer is legally liable for an injury compensable under the Texas Workmen's Compensation Act, the employee has the option of either proceeding at common law against that third party to recover damages or under the Act against the employer's insurance carrier, the Texas Employers' Insurance Association. If he elects first to pursue his remedy at common law against the third party, the employee is not entitled to any compensation under the Act and must bring his suit within two years after the cause of action accrues. If he elects to pursue his remedy under the Act, the employee must file a claim for compensation with the Industrial Accident Board within six months after the occurrence of the injury or the first manifestation of an occupational disease. If good cause is shown, however, the Board may waive strict compliance with the six month requirement. After the Board has issued a final order, the employee may then pursue his remedy at common law against the third party. Texas Civ.Stat. art. 8307, secs. 4a, 6a.

barred by the two year statute of limitations since the injuries occurred in 1964 and Campbell had not filed his claim with the Industrial Accident Board until September 8, 1967. In his answer, Campbell asserted that the action was timely because it was filed about a week after the Board's final order on May 7, 1969. The trial court granted Sonford's motion to dismiss the action.

In reversing the trial court's decision, the Texas Supreme Court held that the statute of limitations "runs against the carrier or the employee in third-party actions authorized by section 6a [of the Workmen's Compensation Act] from the date of the payment of the award of the Industrial Accident Board or the entry of final judgment against the carrier".[38] The Court stated the Texas rule as follows:

> When a claimant elects to proceed under workmen's compensation statutes and qualifies for an award thereunder, the cause of action does not accrue against a third party until the amount of the award made by the Industrial Accident Board is paid by the carrier or until the claimant obtains a final judgment in a court of competent jurisdiction against the carrier. When either of these events occur, the cause of action matures against the third party and the suit authorized by section 6a must be filed on such cause of action either by the carrier or by the insured within two years from that date.

Other Texas cases support this interpretation. See Mourning v. Crown Stevedoring Co., Tex.Civ.App.1967, 417 S.W.2d 725 (writ ref'd n.r.e.); Judice v. Sumner Sollitt Co. of Texas, Tex.Civ.App.1961, 346 S.W.2d 135 (writ ref'd n.r.e.); Thompson v. Graham, Tex.Civ.App.1958, 318 S.W.2d 102 (writ ref'd n.r.e.); Brooks v. Lucky, Tex.Civ.App.

1957, 308 S.W.2d 273 (writ ref'd n.r.e.); Texas Employers' Ins. Ass'n v. Texas & P. Ry. Co., Tex.Civ.App.1939, 129 S.W.2d 746 (writ dism'd jdgmt. cor.); Fidelity Union Casualty Co. v. Texas P. & L. Co., Tex.Civ.App.1931, 35 S.W.2d 782 (writ ref'd).

In the case at bar, the Board issued its final judgment approving the settlement award on July 31, 1969, and the plaintiff filed his damage action a few months later, on October 20. Under the *Campbell* case, therefore, this action is not barred by the statute of limitations.

Even if it is assumed that the defendants are correct in contending that the Workmen's Compensation Act merely tolls the statute of limitations, the present action is still not barred. The defendants assert that a cause of action accrues at the time of the injury and that Borel, having been exposed to asbestos dust since 1936, must have contracted asbestosis long before 1969, the date this action was filed. Alternatively, it is argued that each injurious exposure was a separate tort, resulting in the accrual of a new cause of action, and that Borel cannot recover for any exposure to asbestos dust occurring before 1967.

In Urie v. Thompson, 1949, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282, the Supreme Court considered a similar question involving a locomotive fireman who had contracted silicosis. The defendant urged that the action was barred by the three year statute of limitations imposed by the Federal Employers' Liability Act. Rejecting this interpretation, the Court held that the cause of action did not accrue until the plaintiff either knew or had reason to know of the disease. The Court stated:

> [Any other rule] would mean that at some past moment in time, unknown

---

38. An employee is still subject to the requirement that claims be filed with the Board within six months after the occurrence of the injury or the first manifestation of an occupational disease. Texas Civ. Stat. art. 8307, sec. 4a. In *Campbell*, the Board excused the plaintiff from strict compliance with the six month rule after good cause was shown for the delay. In the present case, the record does not indicate whether this issue was raised before the Board.

and inherently unknowable even in retrospect, [the plaintiff] Urie was charged with knowledge of the slow and tragic disintegration of his lungs; under this view Urie's failure to diagnose within the applicable statute of limitations a disease whose symptoms had not yet obtruded his consciousness would constitute waiver of his right to compensation at the ultimate day of discovery and disability. 69 S.Ct. at 1024, 92 L.Ed. at 1292.

In cases involving similar injuries resulting from exposures to deleterious substances over a period of time, courts have consistently held that the cause of action does not accrue until the effects of such exposures manifest themselves. Associated Indemnity Corp. v. Industrial Accident Commission, 1932, 124 Cal.App. 378, 12 P.2d 1075; United States v. Reid, 5 Cir. 1958, 251 F.2d 691. This principle is analogous to the "discovery rule" applied in medical malpractice cases, which provides that the cause of action does not accrue until the injury is discovered or in the exercise of reasonable diligence should have been discovered. *See* Gaddis v. Smith, Tex.S.Ct. 1967, 417 S.W.2d 577 (citing Urie v. Thompson with approval). Texas courts have applied this rule in many other contexts.[39]

Here, Borel testified in his deposition that he did not know that he had asbestosis until surgery was performed on March 7, 1969. No doctor previously examining Borel had diagnosed his condition as asbestosis. Borel filed his action seven months after he was informed of his condition. The trial court determined that the action was filed timely and refused to submit the issue to the jury. Since there is no substantial evidence opposing the court's finding, we conclude that it did not err on this point.

## VII.

The trial court determined that the total amount of damages was $79,436.24. Since four of the ten defendants named in the original complaint had settled before trial, paying a total of $20,902.20, the trial court rendered judgment jointly and severally against the remaining six defendants for the balance of $58,534.04. The defendants now argue that the trial court should have given each defendant named in the original complaint a prorata credit of four-tenths of the total amount of damages, leaving a balance of $46,669.98 to be rendered against the remaining six defendants. The full credit method used by the trial court, however, was one of the methods of computing damages initially suggested by the defendants. Furthermore, the defendants have failed to show how the full credit method results in any unfairness to them. In these circumstances, we conclude that the trial court properly determined the amount of damages.

## VIII.

It is also contended that the trial court erred in ruling on certain evidentiary matters. The first concerns the trial court's decision to admit into evidence, over defendants' objection, several cards that Borel had used to refresh his memory while his deposition was being taken. The card contained the names of various products manufactured by the defendants and the dates and locations when Borel had used each product. The defendants renew their objection that the cards were inadmissible hearsay.

In general, a writing used to refresh a witness's memory is not testimony and is inadmissible when offered by the witness's party. This does not mean, however, that it is always error for the trial court to permit the jury to inspect such a writing. It may be ad-

---

39. *See, e. g.*, Wise v. Anderson, Tex.Sup.Ct. 1962, 163 Tex. 608, 359 S.W.2d 876 (fraud); Beck v. American Rio Grande Land & Irri-

gation Co., Tex.Civ.App.1931, 39 S.W.2d 640 (writ ref'd).

mitted, for example, when offered by the opposing party or when the jury on its own motion requests to see it. It may also be admitted when the trial court determines that its inspection would assist the jury in understanding the evidence and would not be prejudicial to the opposing party.[40] The rules on admissibility of such a writing "should not be treated as dogmas of inherent efficiency. They are merely crude rules-of-thumb . . . . The trial court's discretion should control". Wigmore, Evidence, § 764 (3 ed.).

██ During his thirty-three years as an industrial insulator, Borel was employed for varying periods at many locations and used several different products containing asbestos. The six defendants manufacture a wide variety of products under different brand-names. In these circumstances, the trial court could justifiably believe that the jury might easily be confused as to when and where Borel had used each of the defendants' products. This situation was aggravated by the fact that Borel had died before trial and only his earlier deposition was available. The defendants have not shown that they were prejudiced by the trial court's ruling. We therefore find no error.

██ The defendants contend that the trial court erred in refusing to admit a statement made by Borel on June 4, 1969, in an application filed as part of his workmen's compensation claim. The statement read: "Although I became ill on the last job I worked, the fact is that I have worked as an insulator for 33 years, subject to the hazards of the job and I cannot truthfully say when I contracted asbestosis." The trial court ruled that it was not an admission and therefore inadmissible hearsay or opinion. After carefully examining the record, we cannot say that the trial court abused its discretion in so ruling

or that the error, if any, was prejudicial to the defendants.

\* \* \* \* \* \*

## IX.

██ In reaching our decision in the case at bar, we recognize that the question of the applicability of Section 402A of the Restatement to cases involving "occupational diseases" is one of first impression. But though the application is novel, the underlying principle is ancient. Under the law of torts, a person has long been liable for the foreseeable harm caused by his own negligence. This principle applies to the manufacture of products as it does to almost every other area of human endeavor. It implies a duty to warn of foreseeable dangers associated with those products. This duty to warn extends to all users and consumers, including the common worker in the shop or in the field. Where the law has imposed a duty, courts stand ready in proper cases to enforce the rights so created. Here, there was a duty to speak, but the defendants remained silent. The district court's judgment does no more than hold the defendants liable for the foreseeable consequences of their own inaction.

For the reasons stated, the decision of the district court is

Affirmed.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

All of the defendants-appellants have moved for a rehearing en banc.

## I.

Three of the movants, Johns-Manville Corporation, Fibreboard Corporation, and Ruberoid Company contend that the Court erred in basing its opinion on "the overriding factor" of "the alleged failure of the defendants to at any time warn

---

40. *See, e. g.,* McCarthy v. Boston & M. R. R., 1942, 92 N.H. 149, 27 A.2d 97; Watkins v. Holmes, 1943, 93 N.H. 53, 35 A.2d 395;

Braden Winch Co. v. Surface Equipment Co., 1946, 196 Okl. 444, 165 P.2d 640.

Borel of the dangers involved in working with asbestos insulation while employed by various independent contractors". They state that the record shows that Johns-Manville placed a warning label on packages of its products in 1964, and that Fibreboard and Ruberoid placed warning labels on their products in 1966. (Borel filed suit in 1969.) The three warnings were substantially the same. Johns-Manville's read as follows:

"This product contains asbestos fiber.
"Inhalation of asbestos in excessive quantities over long periods of time may be harmful.
"If dust is created when this product is handled, avoid breathing the dust.
"If adequate ventilation control is not possible wear respirators approved by the U. S. Bureau of Mines for pneumoconiosis producing dusts."

It should be noted that none of these so-called "cautions" intimated the gravity of the risk: the danger of a fatal illness caused by asbestosis and mesothelioma or other cancers. The mild suggestion that inhalation of asbestos in excessive quantities over a long period of time "may be harmful" conveys no idea of the extent of the danger. The admonition that a worker should "avoid breathing the dust" is black humor: There was no way for insulation workers to avoid breathing asbestos dust. As for wearing respirators if adequate ventilation control is not possible, Borel and other insulators never worked in any place where there was adequate ventilation, and respirators were ineffective: "you can't breathe with the respirator".[1]

 Within the trial judge's instructions, the jury could have concluded that

the "cautions" were not warnings in the sense that they adequately communicated to Borel and other insulation workers knowledge of the dangers to which they were exposed so as to give them a choice of working or not working with a dangerous product. Our opinion points out:

"Borel said that he had known for years that inhaling asbestos dust 'was bad for me' and that it was vexatious and bothersome, but that he never realized that it could cause any serious or terminal illness. Borel emphasized that he and his fellow insulation workers thought that the dust 'dissolves as it hits your lungs'". (493 F.2d 1082)

We quoted Borel's testimony:

"A. Yes, I knew the dust was bad but we used to talk [about] it among the insulators, [about] how bad was this dust, could it give you TB, could it give you this, and everyone was saying no, that dust don't hurt you, it dissolves as it hits your lungs. That was the question you get all the time.

Q. Where would you have this discussion, in your Union Hall?

A. On the jobs, just among the men.
Q. In other words, there was some question in your mind as to whether this was dangerous and whether it was bad for your health?

A. There was always a question, you just never know how dangerous it was. I never did know really. If I had known I would have gotten out of it.

Q. All right, then you did know it had some degree of danger but you didn't know how dangerous it was?

A. I knew I was working with insulation.

---

1. As the opinion points out: "When asked about the use of respirators, Borel replied that they were not furnished during his early work years. Although respirators were later made available on some jobs, insulation workers usually were not required to wear them and had to make a special request if they wanted one. Borel stated that he and other insulation workers found that the respirators furnished them were uncomfortable, could not be worn in hot weather, and—'you can't breathe with the respirator.' Borel further noted that no respirator in use during his lifetime could prevent the inhalation of asbestos dust. As an alternative precaution, therefore, he would sometimes wear a wet handkerchief over his nostrils or apply mentholatum, but these methods were also unsatisfactory and did not exclude all the dust."

Q. Did you know that it contained asbestos?

A. Yes, sir, but I didn't know what asbestos was."

■ The evidence established that Borel was exposed to the products of each of these appellants for extended periods occurring before the alleged warnings were given. Since the disease of asbestosis is cumulative, these earlier exposures to asbestos dust from appellants' products could have contributed substantially to Borel's overall condition. Borel was an insulator for 33 years. Three of the six defendants gave no warnings. The other three used labels on packages of their products, as noted in this opinion; but this practice began a few years before his terminal illness in 1969. By 1964–66, his illness was irreversible. Thus, there were no warnings when they could have effectively allowed Borel to make the choice of encountering or not encountering a known risk. And, in any event, there was significant evidence to create a question for the jury as to the adequacy of the labels to serve as warnings. We cannot say that its resolution of this issue is incorrect as a matter of law. Planters Manufacturing Co. v. Protection Mut., Inc. Co., 5 Cir. 1967, 380 F. 2d 869; Helene Curtis Industries, Inc. v. Pruitt, 5 Cir. 1967, 385 F.2d 841; Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365, 374.

The appellants are in the anomalous position of arguing that (1) the danger was obvious; (2) yet three issued no semblance of a warning and three posted diluted "cautions" which might alert the contractor-purchasers, but not the workers, the final users; and (3) all admit that they never conducted any tests to determine the extent of the danger. In their original briefs, on the issue of liability they seem to rely primarily on the "cautions" to the independent contractors, the purchasers, as if their potential liability ceased to exist before their products reached the ultimate users. That is not the law. We agree with the Restatement: a seller may be liable to the *ultimate* consumer or user for failure to give adequate warnings. The seller's warning must be reasonably calculated to reach such persons, and the presence of an intermediate party will not by itself relieve the seller of this duty. Sterling Drug Inc. v. Cornish, 8 Cir. 1966, 370 F.2d 82; Yarrow v. Sterling Drug, 8 Cir. 1969, 408 F.2d 978; Noel, Products Defective Because of Inadequate Directions or Warnings, 23 S.W.L.J. 256 (1969).

■ Taking our original opinion as a whole, it should be clear that our references to failure to warn refer to failure to warn of the gravity of the danger, that is, the exposure to asbestosis, mesothelioma and other cancers. The first sentence of the opinion states that the case involves "the scope of an asbestos manufacturer's duty to warn". At a number of points we emphasize that the plaintiff's contentions focused on the *"adequacy"* or reasonableness of the warnings.[2] The utility of an insulation product containing asbestos may outweigh the known or foreseeable risk to the insulation workers and thus justify its marketing. The product could still be unreasonably dangerous, however, if unaccom-

---

**2.** "The plaintiff contended that the defendants' products were unreasonably dangerous because of the failure to provide adequate warnings of the foreseeable dangers associated with them." (493 F.2d p. 1086).

"Here, the plaintiff alleged that the defendants' product was unreasonably dangerous because of the failure to give adequate warnings of the known or knowable dangers involved." (493 F.2d p. 1088).

"But, as comment k makes clear, even when such balancing leads to the conclusion that marketing is justified, the seller still has a re-

sponsibility to inform the user or consumer of the risk of harm. The failure to give adequate warnings in these circumstances renders the product unreasonably dangerous." (493 F.2d. p. 1089).

"The failure to give adequate warnings in such circumstances can render the product unreasonably dangerous." (493 F.2d p. 1091).

"As previously discussed, when a failure to give adequate warning is alleged to have made a product unreasonably dangerous, . . . ." (493 F.2d p. 1093).

panied by adequate warnings. An insulation worker, no less than any other product user, has a right to decide whether to expose himself to the risk.

The district court correctly charged the jury:

"As you know, one of the acts of negligence contended for by the plaintiff and perhaps the principal act of negligence is that the manufacturer should have given a warning or a proper warning as to the use of its product. The Court would instruct you that a manufacturer of goods has a duty to give reasonable warning as to the dangers inherent or reasonably foreseeable in using his product. The defendants are under an obligation and duty to give reasonable warning as to the danger of their products, even if the product or products is not being used in a specific manner, so long as the use to which the product was put was a use that the manufacturer could reasonably foresee."

The unpalatable facts are that in the twenties and thirties the hazards of working with asbestos were recognized; that the United States Public Health Service documented the significant risk in asbestos textile factories in 1938; that the Fleischer-Drinker report was published in 1945; that in 1961 Dr. Irving Silikoff and his colleagues confirmed the deadly relationship between insulation work and asbestosis. In January 1969 Borel's illness was diagnosed as irreversible pulmonary asbestosis. During his working years, he received no warnings of any kind from three of the six defendants. The other three defendants issued no warnings until 1964–66, by which time adequate warnings would have come too late for Clarence Borel. On the evidence before it, the jury could properly have decided that Borel received no warnings at all from any defendant at a time when the defendants were under a duty to warn him. Or, with respect to the three defendants who issued watered down "cautions", the jury could properly have held that these warnings were inadequate to communicate to Borel knowledge of the hazards to which he was exposed.

## II.

The movants argue that the decision should be reversed because Borel knew of the danger, and the jury so found.

The plaintiff's cause of action is based on both negligence and strict liability. The district court correctly distinguished one from the other. The jury understood the distinction, for it found that Borel was guilty of contributory negligence but it returned a verdict in favor of Borel on the theory of strict liability.

Section 402A, comment n, of the Restatement of the Law of Torts, deals with contributory negligence and that form of negligence which "commonly passes under the name of assumption of risk"; the two overlap in actions based on strict liability:

"n. Contributory negligence. Since the liability with which this section deals is not based upon negligence and the seller, but is strict liability, the rule applied to strict liability cases [see § 524] applies. Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in *voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense* under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds *unreasonably* to make use of the product and is injured by it, he is barred from recovery."

Here the jury acted within its proper functions in finding, in effect, that Borel did not "voluntarily and unreasonably" proceed "to encounter a known danger". Nor was the evidence so

compelling that reasonable and fair-minded persons would have to conclude Borel "discover[ed] the defect and [was] aware of the danger, and nevertheless proceed[ed] unreasonably to make use of the product". 2 Restatement of Law of Torts (2d ed. 1965) § 402A at 356; Boeing Company v. Shipman, 5 Cir. 1969, 411 F.2d 365, 374.

### III.

The trial court submitted this case to the jury on general instructions and special interrogatories, not "on general verdicts accompanied by a special interrogatory as to Borel's contributory negligence," as stated in the original opinion and as stated by defendants' counsel in objecting to certain portions of the jury charge.

Counsel for the defendants objected to the trial court's not submitting to the jury a special interrogatory based on assumption of risk or volenti non fit injuria. Counsel alluded, however, to the Court's having "covered it to some extent in the general charge". On the motion for a rehearing the movants contend that this Court erred in holding, contrary to Texas law, that under the doctrine of volenti non fit injuria, as a matter of law, Borel's continuing to expose himself to asbestos dust was "unreasonable". They assert, however, that "in effect, the jury found that Borel was not acting as a reasonable man". Moreover, they say that the Court erred in concluding that the jury found that Borel had not assumed the risk; that "no such finding was ever made by the jury as the matter was not submitted to it except in the contributory negligence issue". The defendants timely requested the trial court to submit special interrogatories on voluntary assumption of risk or volenti. When these were refused, the defendants objected to the court's instructions that neither assumption of risk nor contributory negligence would be a defense to an action on the theory of breach of warranty. They renew their argument on their motion for a rehearing and contend that the Court erred in making an

*Erie* judgment that volenti is not a defense in this products liability action in Texas.

We made no such holding, in our original opinion.

We realized, as we said, that "The applicability of *volenti* or contributory negligence defense in a strict liability action is unclear under Texas law". We noted, however, that the Texas Supreme Court has quoted and followed, in part, the position taken in comment n to Section 402A of the Restatement, quoted earlier in this opinion, and that the Court quoted with approval Prosser, Law of Torts (3d ed.) 656. Shamrock Fuel & Oil Sales v. Tunks, 416 S.W.2d 779 (Tex. Sup.Ct.1967). We relied, too, on Messick v. General Motors Corp., 5 Cir. 1972, 460 F.2d 485, in which this Court concluded that Texas courts would probably follow comment n to Section 402A. We stated in our original opinion, therefore, that continued use of a product known to be defective would be a defense to a strict liability action *only* when the continued use was "voluntary" and "unreasonable". Compare Dean Keaton's observation: "First, assumption of risk requires a deliberate encounter with a known risk. Mere negligence in failing to discover a risk is no defense under this doctrine. A person does not deliberately encounter a risk if he does not know it exists. Moreover, the encounter must be voluntary. Therefore, the defense is inapplicable when the injured party had a rational alternative to taking the risk". Keaton, Strict Liability for Product Design, 52 Tex.L.Rev. 81, 89 (1973). Dean Wade takes the same position. Wade, Strict Tort Liability, 19 S. W.L.J. 5, 21 (1965).

Notwithstanding its rejection of the defendants' proffered instructions, the trial judge in this case did in fact inform the jury that assumption of risk was a defense to a strict liability action. He stated:

[T]he defendants contend that the deceased, Mr. Borel, knew of the dangerous nature of the asbestos product man-

ufactured by the defendants in connection with his insulation work and appreciated the danger and with such knowledge voluntarily assumed the risk by continuing his employment. Further, that this knowledge of the danger of the insulation was known to Mr. Borel's contractor or employer. Therefore, the Court would instruct you that if you find from a preponderance of the evidence that the deceased knew of the dangerous nature of the asbestos products with which he was working and appreciated the danger of working with such products or that he had knowledge through his contractor of the dangerous nature of the product and that he assumed the risk by continuing his work, then you would find against the plaintiff and in favor of the defendants.

What more could the defendants want? We considered the instruction overly favorable to the defendants. Notwithstanding, the jury still found against the defendants, in effect, therefore, finding that Borel did not assume the risk.

■■■ Ford Motor Co. v. Henderson, 500 S.W.2d 709 (Tex.Civ.App.1973), on writ of error to the Texas Supreme Court, is not contrary to our holding in the instant case nor to anything we said in the original opinion or in this opinion on rehearing. In that case the Court quoted with approval, as we did, comment n of Section 402A of the Restatement and Prosser, Law of Torts (3d Ed.) 656, both relied on in Shamrock Fuel & Oil v. Tunks. Dean Prosser was the Reporter for the Restatement of Torts and the quotation from his treatise parallels Section 402A. The language of the majority in Ford Motor Company v. Thompson is consistent with Shamrock v. Tunks and with the Borel opinion. In all three cases the courts recognize that contributory negligence or assumption of risk is not a defense to an action based on strict liability when the injured party does not deliberately encounter a risk the existence of which he knows. But it will be a defense "when it consists of a voluntary and unreasonable [Dean Keaton would say "not rational"] conduct to encounter a known risk". (493 F.2d p. 1097).

The actual holding in *Ford* was only that the manufacturer was entitled to submit to the jury as a special issue the defense of contributory negligence or voluntary assumption of risk. The defendant had contended that "the jury could have concluded under the evidence that Mrs. Henderson [the injured party] discovered the defect"; that then she "unreasonably proceed[ed] to encounter a known danger". 500 S.W.2d 709. There is a reference in the majority opinion to the plaintiff's "failure to use ordinary care in continuing to use a product after the discovery of a defect [which] is available as a defense in this state". But the majority supported this holding by a quotation from Section 402A, comment n, and twice scored the word "unreasonably". It is evident, therefore, that the Court had no intention to depart from the Restatement. Moreover, Justice Stephenson, for the majority, quoted Justice Norvell in Shamrock Fuel & Oil Co. v. Tunks to the effect that the cases which refuse to allow the defense of contributory negligence "are entirely consistent with the general rule that such negligence is not a defense to an action founded upon strict liability. . . . They represent the form of contributory negligence which consists of deliberately and unreasonably proceeding to encounter a known danger, and overlaps assumption of risk". 500 S.W.2d 709, 710.

The difference between *Borel* and *Ford* is that in *Borel* the trial judge put to the jury the analogous question the trial judge erroneously rejected in *Ford*.

The dissent in *Ford* gives no aid and comfort to the defendants in the instant case. Justice Dies, dissenting, argues that even if Mrs. Henderson, the injured party, discovered a defect in the product, "unknown before to her, and not caused by her", she is not required to make "a wiser choice of her options" than the choice she made.

There is, therefore, no reason to withhold the issuance of this opinion pending the decision of the Texas Supreme Court in Ford Motor Co. v. Henderson.

IV.

The trial court correctly decided that limitations was not an issue in the case. The reference in our opinion to Gaddis v. Smith, 417 S.W.2d 577 (Tex.S.Ct. 1967) and the discussion pertinent to *Gaddis* are unnecessary to our decision, which we rest squarely on Campbell v. Sonford Chemical Co., 486 S.W.2d 932 (Tex.S.Ct.1972).

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.